WHITE, MAYOR OF BOSTON, ET AL. *v.* MASSACHU-
SETTS COUNCIL OF CONSTRUCTION EMPLOYERS,
INC., ET AL.

No. 81–1003.  Argued November 1, 1982—Decided February 28, 1983

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, MARSHALL, POWELL, STEVENS, and O'CONNOR, JJ., joined. BLACKMUN, J., filed an opinion concurring in part and dissenting in part, in which WHITE, J., joined, *post*, p. 215.

*Laurence H. Tribe* argued the cause for petitioners. With him on the briefs were *Kurt M. Pressman, Mark D. Stern,* and *Harold J. Carroll.*

*Paul J. Kingston* argued the cause and filed a brief for respondents.*

JUSTICE REHNQUIST delivered the opinion of the Court.

In 1979 the Mayor of Boston, Mass., issued an executive order[1] which required that all construction projects funded

___

*Arthur Kinoy* filed a brief for the Affirmative Action Coordinating Center et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *J. Albert Woll, Laurence J. Cohen, Laurence Gold,* and *George Kaufmann* for the American Federation of Labor and Congress of Industrial Organizations et al.; and by *Stephen A. Bokat* for the Chamber of Commerce of the United States.

*Wayne S. Henderson* and *Robert E. Dickinson* filed a brief for the New England Legal Foundation et al. as *amici curiae.*

[1] The executive order provides:

"On any construction project funded in whole or in part by City funds, or funds which, in accordance with a federal grant or otherwise, the City expends or administers, and to which the City is a signatory to the construction contract, the worker hours on a craft-by-craft basis shall be performed, in accordance with the contract documents established herewith, as follows:

"a. at least 50% by bona fide Boston residents;

"b. at least 25% by minorities;

"c. at least 10% by women."

Only the residency requirement is being challenged.

in whole or in part by city funds, or funds which the city had the authority to administer, should be performed by a work force consisting of at least half bona fide residents of Boston.[2] The Supreme Judicial Court of Massachusetts decided that the order was unconstitutional, observing that the Commerce Clause "presents a clear obstacle to the city's order." 384 Mass. 466, 479, 425 N. E. 2d 346, 354 (1981). We granted certiorari to decide whether the Commerce Clause of the United States Constitution, Art. I, § 8, cl. 3, prevents the city from giving effect to the Mayor's order. 455 U. S. 919 (1982). We now conclude that it does not and reverse.

## I

We were first asked in *Hughes* v. *Alexandria Scrap Corp.*, 426 U. S. 794 (1976), to decide whether state and local governments are restrained by the Commerce Clause when they seek to effect commercial transactions not as "regulators" but as "market participants." In that case, the Maryland Legislature, in an attempt to encourage the recycling of abandoned automobiles, offered a bounty for every Maryland-titled automobile converted into scrap if the scrap processor supplied documentation of ownership. An amendment to the Maryland statute imposed more exacting documentation requirements on out-of-state than in-state processors, and out-of-state processors in turn demanded more exacting documentation from those who sold the junked automobiles for scrap. As a result, it became easier for those in possession of the automobiles to sell to in-state processors. "The practical effect was substantially the same as if Maryland had withdrawn altogether the availability of bounties on hulks delivered by unlicensed suppliers to licensed non-Maryland processors." *Id.*, at 803, n. 13. In upholding the Maryland

---

[2] In 1980, of approximately $483 million expended on construction in the city of Boston, some $54 million, or 11%, was spent on projects to which the executive order applied. Of this latter amount, approximately $34 million represented projects being funded in part through federal Urban Development Action Grants (UDAG's).

statute in the face of a Commerce Clause challenge, we said that "[n]othing in the purposes animating the Commerce Clause prohibits a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others." *Id.*, at 810 (footnotes omitted). Because Maryland was participating in the market, rather than acting as a market regulator, we concluded that the Commerce Clause was not "intended to require independent justification," *id.*, at 809, for the statutory bounty.

We faced the question again in *Reeves, Inc.* v. *Stake*, 447 U. S. 429 (1980), when confronted with a South Dakota policy to confine the sale of cement by a state-operated cement plant to residents of South Dakota. We underscored the holding of *Hughes* v. *Alexandria Scrap Corp.*, saying:

> "The basic distinction drawn in *Alexandria Scrap* between States as market participants and States as market regulators makes good sense and sound law. As that case explains, the Commerce Clause responds principally to state taxes and regulatory measures impeding free private trade in the national marketplace. [Citation omitted.] There is no indication of a constitutional plan to limit the ability of the States themselves to operate freely in the free market." 447 U. S., at 436–437.[3]

---

[3] We also noted the policy in support of this limitation on the Commerce Clause:

"Restraint in this area is also counseled by considerations of state sovereignty, the role of each State '"as guardian and trustee for its people,"' *Heim* v. *McCall*, 239 U. S. 175, 191 (1915), quoting *Atkin* v. *Kansas*, 191 U. S. 207, 222–223 (1903), and 'the long recognized right of trader or manufacturer, engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.' *United States* v. *Colgate & Co.*, 250 U. S. 300, 307 (1919). Moreover, state proprietary activities may be, and often are, burdened with the same restrictions imposed on private market participants. Evenhandedness suggests that, when acting as proprietors, States should similarly share existing

We concluded that South Dakota, "as a seller of cement, unquestionably fits the 'market participant' label" and applied the "general rule of *Alexandria Scrap.*" *Id.*, at 440.

*Alexandria Scrap* and *Reeves*, therefore, stand for the proposition that when a state or local government enters the market as a participant it is not subject to the restraints of the Commerce Clause. As we said in *Reeves*, in this kind of case there is "a single inquiry: whether the challenged 'program constituted direct state participation in the market.'" 447 U. S., at 436, n. 7. We reaffirm that principle now.

The Supreme Judicial Court of Massachusetts concluded that the city of Boston is not participating in the market in the sense described in *Alexandria Scrap Corp.* and *Reeves* because the order applies where the city is acting in a nonproprietary capacity, has a significant impact on interstate commerce, is more sweeping than necessary to achieve its objectives, and applies to funds the city receives from federal grants. 384 Mass., at 479–480, 425 N. E. 2d, at 354–355. For the same reasons the court found that the city is not a market participant, it concluded that the executive order violated the substantive restraints of the Commerce Clause.[4] *Ibid.*

## II

Petitioners and respondents both, to a greater or lesser extent, seek to have us decide questions not presented by the record in this case. In support of the Massachusetts court's finding that the city is acting in a nonproprietary capacity, respondents urge that much of the construction subject to the Mayor's order involved nonpublic projects that were financed largely through private funds. While the Mayor's order by

freedoms from federal constraints, including the inherent limits of the Commerce Clause." 447 U. S., at 438–439 (footnotes omitted).

[4] Respondents made several other challenges to the order, none of which are before us. Respondents also directed challenges to resident preferences contained in other state and local laws. None of these provisions is before us.

its terms would appear to apply to such construction, there is simply nothing in the record before us to support the conclusion that city funds were used for these types of construction projects. Respondents, had they wished to raise this question, were obligated to offer some evidence that city funds and private funds were used jointly to finance construction of some of the projects which were in fact subjected to the provisions of the Mayor's order; nothing in the record supports such a conclusion.[5] The only issues before us, then, are the propriety of applying the Mayor's executive order to projects funded wholly with city funds and projects funded in part with federal funds. We address first the application of the order to city-funded projects.

The Supreme Judicial Court of Massachusetts expressed reservations as to the application of the "market participation" principle to the city here, reasoning that "the implementation of the mayor's order, will have a significant impact on those firms which engage in specialized areas of construction and employ permanent works crews composed of out-of-State residents." 384 Mass., at 479, 425 N. E. 2d, at 354. Even if this conclusion is factually correct,[6] it is not relevant

---

[5] The case was submitted below on an agreed statement of facts. The only reference in that statement to the funds affected by the order provides:

"The approximate dollar value of construction, both private and public, within the City of Boston in 1980 was $482,886,000; of that amount approximately [$]54,421,040 represented construction projects 'funded in whole or in part by City funds, or funds which, in accordance with a federal grant or otherwise, the City expends or administers, and to which the City is a signatory to the construction contract' to which the Executive Order, by its terms, was applicable. Of that $54,421,040 approximately $34,000,-000 represented projects involving Urban Development Action Grants." Agreed Statement of Facts, at A42.

[6] The record does not readily support a finding of "significant impact" on firms employing out-of-state residents. The parties stipulated that a "*small number* of plaintiff contractors are out-of-state contractors who have regular and permanent work crews comprised entirely of out-of-state residents. These contractors for the most part are those who perform

to the inquiry of whether the city is participating in the marketplace when it provides city funds for building construction. If the city is a market participant, then the Commerce Clause establishes no barrier to conditions such as these which the city demands for its participation. Impact on out-of-state residents figures in the equation only after it is decided that the city is regulating the market rather than participating in it, for only in the former case need it be determined whether any burden on interstate commerce is permitted by the Commerce Clause.

The same may be said of the Massachusetts court's finding that the executive order sweeps too broadly, creating more burden than is necessary to accomplish its stated objectives. *Id.*, at 480, 425 N. E. 2d, at 355. While relevant if the Commerce Clause imposes restraints on the city's activity, this characterization is of no help in deciding whether those restraints apply. The Massachusetts court relied in part on our decision in *Hicklin* v. *Orbeck*, 437 U. S. 518 (1978), saying that "as in *Hicklin, supra,* there is a broadly drawn statute which sweeps far wider than merely favoring unemployed or underemployed local residents." 384 Mass., at 480, 425 N. E. 2d, at 355.

In *Hicklin* we considered an Alaska statute which required employment in all work connected with oil and gas leases to which the State was a party to be offered first to "qualified" Alaska residents in preference to nonresidents. The State sought to justify the "Alaska Hire" law on the ground that

---

specialty work. . . ." *Id.*, at A41 (emphasis added). Although the parties also stipulated that some out-of-state workers who would otherwise have been employed on the projects would be unemployed and that some out-of-state contractors would be discouraged from bidding on public construction work, *id.*, at A37, the record does not reveal that any significant number of out-of-state workers or contractors has withdrawn from the construction market because of the order. Furthermore, the record does not show that the increased employment of city residents in publicly funded construction projects has been accompanied by a decline in the percentage of out-of-state residents. See *id.*, at A48.

the underlying oil and gas were owned by the State itself. Analyzing the case under the Privileges and Immunities Clause of Art. IV, § 2, we held that mere ownership of a natural resource did not in all circumstances render a state regulation such as the "Alaska Hire" law immune from attack under that Clause. We summarized our view of the Alaska statute in these words:

> "In sum, the Act is an attempt to force virtually all businesses that benefit in some way from the economic ripple effect of Alaska's decision to develop its oil and gas resources to bias their employment practices in favor of the State's residents." 437 U. S., at 531.

Even though respondents no longer press the Privileges and Immunities Clause holding of *Hicklin* in support of their Commerce Clause argument, we note that on the record before us the application of the Mayor's executive order to contracts involving only city funds does not represent the sort of "attempt to force virtually all businesses that benefit in some way from the economic ripple effect" of the city's decision to enter into contracts for construction projects "to bias their employment practices in favor of the [city's] residents."[7]

---

[7] JUSTICE BLACKMUN's opinion dissenting in part, *post*, p. 215, argues that the Mayor's order goes beyond market participation because it regulates employment contracts between public contractors and their employees. We agree with JUSTICE BLACKMUN that there are some limits on a state or local government's ability to impose restrictions that reach beyond the immediate parties with which the government transacts business. Cf. *Hicklin* v. *Orbeck*, 437 U. S. 518, 529–531 (1978). We find it unnecessary in this case to define those limits with precision, except to say that we think the Commerce Clause does not require the city to stop at the boundary of formal privity of contract. In this case, the Mayor's executive order covers a discrete, identifiable class of economic activity in which the city is a major participant. Everyone affected by the order is, in a substantial if informal sense, "working for the city." Wherever the limits of the market participation exception may lie, we conclude that the executive order in this case falls well within the scope of *Alexandria Scrap* and *Reeves*.

The Supreme Judicial Court of Massachusetts also observed that "a significant percentage of the funds affected by the order are received from Federal sources." 384 Mass., at 479, 425 N. E. 2d, at 354. The record does indicate that of approximately $54 million expended on projects affected by the Mayor's executive order, some $34 million represented projects being funded in part through UDAG's.[8] While the record assigns specific dollar amounts only for UDAG's, the parties also have stipulated that the executive order applies to Community Development Block Grants (CDBG's) and Economic Development Administration Grants (EDAG's).[9]

---

[8] Not all UDAG projects in Boston have been subjected to the executive order. Department of Housing and Urban Development (HUD) publications indicate that in 1980 Boston received $28,600,000 through UDAG's and that this money was to be spent on projects costing a total of $397 million. U. S. Dept. of HUD, UDAG Project Approval List, Region I, p. 1 (Boston, Mass., Feb. 9, 1982). While we do not know what percentage of the $34 million spent on projects affected by the executive order was in fact UDAG money, we do know that overall UDAG funds constituted 7% of the total costs of projects they were expended on.

[9] UDAG's are administered by HUD pursuant to the Housing and Community Development Act of 1977, 42 U. S. C. § 5318 (1976 ed., Supp. V). The HUD regulations governing the program are found at 24 CFR pt. 570, subpart G (1982). CDBG's are administered by HUD pursuant to the Housing and Community Development Act of 1974, 42 U. S. C. § 5301 *et seq.* (1976 ed. and Supp. V), and the implementing regulations at 24 CFR pt. 570 (1982). EDAG's are administered by the Department of Commerce in accordance with the Public Works and Economic Development Act of 1965, 42 U. S. C. § 3131 *et seq.* (1976 ed. and Supp. V), and the implementing regulations at 13 CFR pt. 305 (1982).

Respondents have asserted in this Court that the executive order also applies to funds the city receives from the Department of Transportation. In the agreed statement of facts the parties stipulated that a resident preference in a state statute challenged below applied to DOT funds. Agreed Statement of Facts, at A45. There is, however, nothing in the record to indicate that DOT funds are affected by the order. In fact, the parties stipulate that the affected federal funds come from UDAG's, CDBG's, and EDAG's. *Id.*, at A43–A44. Without support in the record for a contrary conclusion, we decide this case as though DOT funds are not in-

But all of this proves too much. The Commerce Clause is a grant of authority to Congress, and not a restriction on the authority of that body. See *American Power & Light Co.* v. *SEC*, 329 U. S. 90 (1946); *Gibbons* v. *Ogden*, 9 Wheat. 1 (1824). Congress, unlike a state legislature authorizing similar expenditures, is not limited by any negative implications of the Commerce Clause in the exercise of its spending power. Where state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce. *Southern Pacific Co.* v. *Arizona*, 325 U. S. 761, 769 (1945). Thus, if the restrictions imposed by the city on construction projects financed in part by federal funds are directed by Congress then no dormant Commerce Clause issue is presented.

An examination of the applicable statutes reveals that these federal programs were intended to encourage economic revitalization, including improved opportunities for the poor, minorities, and unemployed.[10] Examination of the regulations set forth in the margin indicates that the Mayor's executive order sounds a harmonious note; the federal regulations for each program affirmatively permit the type of parochial favoritism expressed in the order.[11]

---

volved. See *Ramsey* v. *Mine Workers*, 401 U. S. 302, 312 (1971); *Tyrrell* v. *District of Columbia*, 243 U. S. 1, 4–6 (1917).

[10] See 42 U. S. C. § 5318 (1976 ed., Supp. V) (UDAG's); § 5301 (1976 ed. and Supp. V) (CDBG's); § 3131 (EDAG's).

[11] In issuing implementing regulations to carry out its authority under the UDAG program, HUD requires that a city certify that its project would not be undertaken by the private sector without public funds and that the project will alleviate economic distress by helping the poor, minorities, and unemployed. 24 CFR § 570.458(c) (1982). The regulations further provide that the city must "comply with . . . Section 3 of the Housing and Urban Development Act of 1968, as amended, and implementing regulations at 24 CFR Part 135." 24 CFR § 570.458(c)(14)(ix)(D) (1982). The regulations implementing that Act provide that "to the greatest extent feasible opportunities for training and employment arising in connection with the planning and carrying out of any project assisted under any such pro-

## III

We hold that on the record before us the application of the Mayor's executive order to the contracts in question did not violate the Commerce Clause of the United States Constitution.[12] Insofar as the city expended only its own funds in en-

gram be given to lower income persons *residing in the area of such project. . . .*" 24 CFR § 135.1(a)(2)(i) (1982) (emphasis added).

Similarly, CDBG regulations provide that a recipient of funds must

"comply with section 3 of the Housing and Urban Development Act of 1968, as amended, requiring that to the greatest extent feasible *opportunities for training and employment be given to lower-income residents of the project area* and contracts for work in connection with the project be awarded to eligible business concerns which are located in, or owned in substantial part by, persons residing in the area of the project." 24 CFR § 570.307(m) (1982) (emphasis added).

EDAG regulations provide:

"The maximum feasible employment of local labor shall be made in the construction of public works and development facility projects receiving direct grants and loans. Accordingly, every contractor and subcontractor undertaking to do work on any such project which is or reasonably may be done as on-site work, shall be required to employ in carrying out such contract work, qualified *persons who regularly reside in the designated area where such project is to be located,* or in the case of economic development centers, qualified persons who regularly reside in the center or in the adjacent or nearby redevelopment areas within the economic development district. . . .￼" 13 CFR § 305.54(a) (1982) (emphasis added).

[12] Respondents ask us to decide whether the executive order offends the Privileges and Immunities Clause of Art. IV, § 2, which provides: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." In addressing this issue, the Massachusetts court said:

"The preference is for inhabitants of the city, and its 'negative' effect is felt in significant part by other citizens of the Commonwealth, as well as by residents of other States. In such circumstances it may be more difficult to find a violation of the privileges and immunites clause because the discrimination adversely affects citizens of the Commonwealth as well." 384 Mass. 466, 478, 425 N. E. 2d 346, 354 (1981).

Because of its disposition under the Commerce Clause, however, the court did not resolve this issue.

tering into construction contracts for public projects, it was a market participant and entitled to be treated as such under the rule of *Hughes* v. *Alexandria Scrap Corp.*, 426 U. S. 794 (1976). Insofar as the Mayor's executive order was applied to projects funded in part with funds obtained from the federal programs described above, the order was affirmatively sanctioned by the pertinent regulations of those programs. The judgment of the Supreme Judicial Court of Massachusetts is therefore reversed, and the case is remanded to that court for proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN, with whom JUSTICE WHITE joins, concurring in part and dissenting in part.

I agree with the Court that this case presents two issues: (1) the validity of the Mayor's executive order as applied to projects funded entirely by the city of Boston with its own revenues, and (2) the validity of the order as applied to projects funded in part with federal revenues pursuant to certain congressionally created grant programs.

I

Respecting the second issue, I am in agreement with the Court's conclusion that Congress, in creating the grant programs in question, specifically authorized "the type of parochial favoritism expressed in the order." *Ante*, at 213. As the Court holds, Congress unquestionably has the power to authorize state or local discrimination against interstate commerce that otherwise would violate the dormant aspect of the Commerce Clause. *Prudential Ins. Co.* v. *Benjamin*, 328 U. S. 408, 418–427 (1946).[1]

---

This question has not been, to any great extent, briefed or argued in this Court. We did not grant certiorari on the issue and remand without passing on its merits. See *General Talking Pictures Corp.* v. *Western Electric Co.*, 304 U. S. 175, 177–178 (1938).

[1] Because the Court does not pass on the possible invalidity of the executive order under the Privileges and Immunities Clause, U. S. Const.,

## II

I do not agree, however, with the Court's holding that the executive order is immune from Commerce Clause scrutiny insofar as it applies to city activities undertaken *without* specific congressional authorization.

The Court rejects certain arguments advanced by the Supreme Judicial Court of Massachusetts as relevant only if the order were "regulation of," rather than "participation in," the market. *Ante,* at 210–211. The Court holds that the order is the latter rather than the former because, in the Court's view, it "falls well within the scope," *ante,* at 211, n. 7, of the Court's decisions in *Hughes* v. *Alexandria Scrap Corp.,* 426 U. S. 794 (1976), and *Reeves, Inc.* v. *Stake,* 447 U. S. 429 (1980). With due respect, this plainly is not so.

In *Alexandria Scrap,* the effect of the Maryland statute was to offer a subsidy only to scrap processors located within the State. See 426 U. S., at 803, n. 13. The Court held that a State, free from Commerce Clause scrutiny, may enter "the market as a purchaser, in effect, of a potential article of interstate commerce" and "restric[t] its trade to its own citizens or businesses within the State." *Id.,* at 808. *Alexandria Scrap* thus permits a State to prefer its residents as direct recipients of certain subsidies. See *Reeves,* 447 U. S., at 440, n. 14 (discussing *Alexandria Scrap*).

In *Reeves,* South Dakota refused to sell cement to out-of-state consumers until the orders of all in-state customers were filled. The Court held that the Commerce Clause is not implicated when a State prefers its own residents as direct purchasers of state-produced goods. Neither *Reeves*

---

Art. IV, § 2, cl. 1, it has no occasion to determine whether Congress may authorize, through affirmative legislation, what otherwise would be a violation of that Clause. This question may present considerations different from those presented by the dormant Commerce Clause. See L. Tribe, American Constitutional Law § 6–31, p. 403, n. 18 (1978). For the reasons given by the Court, *ante,* at 214–215, n. 12, I also decline to reach this issue.

nor *Alexandria Scrap*, however, went beyond ensuring that the States enjoy " 'the long recognized right of trader or manufacturer, engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.' " *Reeves*, 447 U. S., at 438–439, quoting *United States* v. *Colgate & Co.*, 250 U. S. 300, 307 (1919).

Boston's executive order goes much further. The city has not attempted merely to choose the "parties with whom [it] will deal."[2] Instead, it has imposed as a condition of obtaining a public construction contract the requirement that *private firms* hire only Boston residents for 50% of specified jobs.[3] Thus, the order directly restricts the ability of private employers to hire nonresidents, and thereby curtails nonresidents' access to jobs with private employers. I had thought it well established that, under the Commerce Clause, States and localities cannot impose restrictions granting their own residents either the exclusive right, or a priority, to private sector economic opportunities. See *H. P. Hood & Sons* v. *Du Mond*, 336 U. S. 525 (1949); *Pennsylvania* v. *West Virginia*, 262 U. S. 553 (1923); cf. *Hicklin* v. *Orbeck*, 437 U. S. 518 (1978) (decided under the Privileges and Immunities Clause).

Such restrictions are not immune from attack under the Commerce Clause solely because the city has imposed them as conditions to its contracts with private employers. In *Reeves*, the Court, I thought, carefully explored reasons the policy there at issue might not have been entitled to the market participant exemption, notwithstanding the policy's essentially proprietary nature. 447 U. S., at 440–447. The

---

[2] Had the city decided to limit its *own* hiring to Boston residents, its decision would almost certainly have been permissible under *McCarthy* v. *Philadelphia Civil Service Comm'n*, 424 U. S. 645 (1976), as well as *Reeves* and *Alexandria Scrap*.

[3] That the order limits the preference to 50% of the covered jobs is, of course, not relevant to the applicability of the market participant exemption. If such preferences do not implicate the dormant Commerce Clause, they are immune even if they apply to 100% of a contractor's jobs.

Court also observed that the line between "market participant" and "market regulator" is not always bright: "South Dakota, as a seller of cement, unquestionably fits the 'market participant' label more comfortably than a State acting to subsidize local scrap processors." *Id.*, at 440. See *id.*, at 440, n. 14 ("We have no occasion here to inquire whether subsidy programs unlike that involved in *Alexandria Scrap* warrant characterization as proprietary, rather than regulatory, activity").

The line between regulation and market participation, for purposes of the Commerce Clause, should be drawn with reference to the constitutional values giving rise to the market participant exemption itself. As the Court recognized in *Reeves*, the most important of these is that historically the "Commerce Clause responds principally to state taxes and regulatory measures impeding free private trade in the national marketplace"; it was not designed "to limit the ability of the States themselves to operate freely in the free market." *Reeves*, 447 U. S., at 437. The Court also observed that the distinction between participation and regulation rests on core notions of state sovereignty, coupled with the traditional right of private traders to determine the identities of their bargaining partners free from governmental interference. *Id.*, at 438–439. The legitimacy of a claim to the market participant exemption thus should turn primarily on whether a particular state action more closely resembles an attempt to impede trade among private parties, or an attempt, analogous to the accustomed right of merchants in the private sector, to govern the State's own economic conduct and to determine the parties with whom it will deal.

The simple unilateral refusals to deal that the Court encountered in *Reeves* and *Alexandria Scrap* were relatively pure examples of a seller's or purchaser's simply choosing its bargaining partners, "long recognized" as the right of traders in our free enterprise system. The executive order in this case, in notable contrast, by its terms is a direct attempt to

govern private economic relationships. The power to dictate to another those with whom *he* may deal is viewed with suspicion and closely limited in the context of purely private economic relations.[4] When exercised by government, such a power is the essence of regulation.

---

[4] Compare *United States* v. *Colgate & Co.*, 250 U. S. 300, 307 (1919) (unquestioned right of trader unilaterally to refuse to deal with those retailers who do not adhere to retail price schedule), relied upon in *Reeves*, 447 U. S., at 439, with *United States* v. *Parke, Davis & Co.*, 362 U. S. 29, 45–46 (1960) (trader violates Sherman Act by inducing wholesalers to refuse to deal with retailers who will not adhere to price schedule), *United States* v. *Arnold, Schwinn & Co.*, 388 U. S. 365, 382 (1967) ("Once the manufacturer has parted with title and risk, he has parted with dominion over the product, and his effort thereafter to restrict territory or persons to whom the product may be transferred" violates the Sherman Act), and *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36, 49 (1977) (overruling *Schwinn* in part; nonprice vertical market restrictions are not *per se* unlawful, but should be judged individually under the "rule of reason" to determine whether they "should be prohibited as imposing an unreasonable restraint on competition").

Conditioning a willingness to deal with potential bargaining partners on their derivative refusals to deal with others is particularly suspect where those whom the trader attempts to isolate are its competitors. See *Lorain Journal Co.* v. *United States*, 342 U. S. 143, 154–155 (1951). Here, the citizens of Boston, through their Mayor, have sought to do just this by requiring those wishing to deal with their city government to refuse to hire nonresidents competing with citizens for jobs. This anticompetitive and suspect goal will be present whenever a unit of state or local government requires recipients of public contracts or government subsidies to deal only with that government's constituents.

Congress, in § 8(e) of the National Labor Relations Act, has expressly prohibited labor organizations from requiring employers to agree "to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person," and has declared any such agreement to be void. 29 U. S. C. § 158(e). On the other hand, permitting labor unions to refuse to deal with the primary employer is the staple of federal labor policy, and nothing prevents an employer from refusing unilaterally to deal with others for any lawful reason. To be sure, in the construction industry, at issue in the executive order, collective-bargaining agreements are expressly exempted from this proscription of "hot cargo" clauses. *Ibid.;* see

Attempts directly to constrict private economic choices through contractual conditions are particularly akin to regulation because, unlike simple refusals to deal but like conventional market regulation, they threaten to extend their regulatory impact well beyond the transaction in which the State has an interest. A requirement that firms wishing to deal with the State hire a certain percentage of their work force from among state residents in practice may constrict the opportunities of nonresidents to work on projects with no connection whatever with the governmental entity imposing the condition. A firm that relies to any significant degree on a permanent work force will be compelled to favor local residents for these positions. An analogous requirement that such firms purchase only from in-state suppliers the goods used in state projects also might constrict interstate trade wholly unrelated to government business. If economic considerations counsel in favor of stable relationships with suppliers, a firm wishing to deal with the State will be compelled to favor local firms across the board. The effect of such "conditions" on the ability of nonresidents to deal with affected firms would be virtually identical to the effect of a conventional market regulation requiring such practices.

In *Reeves*, the Court cited "considerations of state sovereignty" as another factor counseling restraint in applying the Commerce Clause to "proprietary" activity. The States have a sovereign interest in some freedom from federal interference when hiring state employees. It might be argued that because the city could have chosen to build the projects covered by the order itself and, free from dormant Com-

---

*Woelke & Romero Framing, Inc.* v. *NLRB*, 456 U. S. 645 (1982). That Congress has chosen, however, for reasons peculiar to labor policy and the history and nature of collective bargaining in the construction industry, to exclude collective agreements in that industry from this restriction does not detract from my basic point: there is a world of difference between the kind of "proprietary" activity at issue here and the kind exempted from dormant Commerce Clause scrutiny in *Reeves* and *Alexandria Scrap*.

merce Clause restraint, could have hired local residents, the city may contract to have the work done by private firms on the condition that the firms hire local residents.[5] But the Court never has suggested that the State's special sovereign interest in determining whom it will hire, and in setting the terms and conditions of public employment, extends to dictating whom private parties with which it contracts will hire, or the terms and conditions of private employment. In my view, the State's interest in managing its relations with its employees is fully safeguarded by its power to do the work itself if it so chooses, with such immunity from the Commerce Clause as attaches in that situation. The Court's observation in *Reeves*, 447 U. S., at 438–439, tying concerns for state sovereignty to a merchant's customary power to exercise his independent discretion as to the parties with whom he will deal, is fully consistent with this view. But when a State attempts to arrogate unto itself the "independent discretion" of others to deal with whom they please, it exercises regulatory power that must be consistent with the requirements of the Commerce Clause. See generally Varat, State "Citizenship" and Interstate Equality, 48 U. Chi. L. Rev. 487, 560–564 (1981).

This approach fully safeguards the power of the State to limit to state residents the direct benefits of subsidy programs supported with state funds. It permits a State to prefer local businesses as providers of the goods it purchases in the marketplace, and to prefer local residents as direct purchasers or recipients of state-created bounty. But it does not permit a State to impose clear market regulations as a condition of a contract or of a subsidy, using the tremendous power of the state treasury directly to impede the free flow of private trade in interstate commerce, or, what may be worse, to discriminate against such commerce. South Dakota should not be immune from the Commerce Clause if, for

---

[5] Indeed, the Court appears to rely on this argument. See *ante*, at 211, n. 7.

example, it imposes as a condition on the sale of state-owned cement that purchasers employ only South Dakota residents, or resell the cement only to South Dakota customers. Cf. *Reeves*, 447 U. S., at 444, n. 17 ("Nor has South Dakota cut off access to its own cement altogether, for the policy does not bar resale of South Dakota cement to out-of-state purchasers"). Similarly, Maryland should not be free of Commerce Clause scrutiny if it imposes as a condition of receiving a bounty, like that at issue in *Alexandria Scrap*, that scrap processors employ only Maryland residents, or resell the processed scrap only in-state. In my view such conditions, like the condition at issue here, directly intrude upon the historic Commerce Clause concern with "measures impeding free private trade in the national marketplace." *Reeves*, 447 U. S., at 437.

I do not intend to suggest that the Court necessarily would decide these variations of *Alexandria Scrap* and *Reeves* as it has decided this case; evidently, the Court acknowledges that "restrictions that reach beyond the immediate parties with which the government transacts business" pose Commerce Clause questions more profound than did the restrictions at issue in *Alexandria Scrap* and *Reeves*. *Ante*, at 211, n. 7. The Court indicates that it upholds the executive order on the understanding that, with the exception of the federal grant programs, it is applied solely to construction projects funded entirely by the city. *Ante*, at 208–209. Because many construction contractors hire a substantially different work crew for each project they undertake, applied to such projects the Mayor's order is arguably limited, as the Court says, to a "discrete, identifiable class of economic activity in which the city is a major participant." *Ante*, at 211, n. 7.[6]

_____

[6] See S. Rep. No. 187, 86th Cong., 1st Sess., 27 (1959) ("The occasional nature of the employment relationship makes [the construction] industry markedly different from manufacturing and other types of enterprise. An individual employee typically works for many employers and for none of them continuously. Jobs are frequently of short duration, depending upon

This unique aspect of employment in the construction industry—and of public works construction projects—must also underlie the Court's related justification that "[e]veryone affected by the order is, in a substantial if informal sense, 'working for the city.'" *Ibid.*

I am not persuaded, however, that even the comparatively limited terms of the executive order constitute "market participation" rather than "market regulation." The "sense" in which those affected by the Mayor's order "work for the city" is so "informal," in my view, as to lack substance altogether. The city does not hire them, fire them, negotiate with them or their representative about the terms of their employment, or pay their wages. In the case of the employees of subcontractors regulated by the order, the city does not even pay, or contract directly with, their employers. In short, the economic choices the city restricts in favor of its residents are the choices of private entities engaged in interstate commerce. Thus, the executive order directly impedes "free private trade in the national marketplace," and for that reason I would not hold it immune from Commerce Clause scrutiny. I therefore reach the question whether the order imposes an impermissible burden on interstate commerce.

### III

As the Court recognizes, the order constitutes "parochial favoritism" of Boston residents over nonresidents of Boston and Massachusetts for access to private sector jobs. *Ante,* at 213. Thus, the order is a "protectionist measure" subject to the rule of virtually *per se* invalidity established by many of this Court's cases. See, *e. g., Philadelphia* v. *New Jersey,* 437 U. S. 617, 624 (1978).[7]

_____

various stages of construction"). It is noteworthy, however, that in this case the parties have stipulated that the order affects some "contractors who have regular and permanent work crews." Agreed Statement of Facts, App. to Pet. for Cert. A41.

[7] I reject the suggestion that the record does not establish a cognizable burden on interstate commerce. See *ante,* at 209–210, and n. 6. The city

That the order burdens Massachusetts residents living outside Boston to the same extent as residents of other States does not save the order from this rule. First, the order derives in part from a state statute encouraging *all* Massachusetts communities to institute similar measures. Mass. Gen. Laws Ann., ch. 149, § 26 (West 1982).[8] That statute is clearly designed to benefit all Massachusetts residents at the expense of all residents of other States. In carrying out this statutory mandate, Boston, a creature of the Commonwealth, is tainted by participation in the Commonwealth's larger and clearly discriminatory scheme.

Second, and more significant, the order would be improper under *Dean Milk Co.* v. *Madison,* 340 U. S. 349 (1951), even absent the state statute. In *Dean Milk,* this Court held that a Madison, Wis., city ordinance "plainly discriminate[d] against interstate commerce," even though "Wisconsin milk from outside the Madison area [was] subjected to the same proscription as that moving in interstate commerce." *Id.,* at 354, and n. 4. This was so because the ordinance "erect[ed] an economic barrier protecting a major local industry against competition from without the State." *Id.,* at 354. The

has stipulated that, as a result of this order, some construction workers who are nonresidents of Massachusetts will be unemployed; contractors from outside Massachusetts will be discouraged from bidding on affected projects; and the costs of construction on affected projects will increase. Agreed Statement of Facts, App. to Pet. for Cert. A37.

[8] The Mayor's executive order itself states that one of its purposes is to satisfy the city's "statutory obligation to give preference to its residents in hiring for public[ly] funded construction projects pursuant to [Massachusetts] G. L. c. 149, § 26." App. to Pet. for Cert. A19. The statute to which the order refers provided: "Each county, town or district in the construction of public works, or persons contracting or subcontracting for such works, shall give preference [in hiring] to veterans and citizens who are residents of such county, town or district." Mass. Gen. Laws Ann., ch. 149, § 26 (West 1982). In its decision holding the city order unconstitutional, the Supreme Judicial Court of Massachusetts also struck down this statute. 384 Mass. 466, 476–478, 425 N. E. 2d 346, 352–353 (1981). The Commonwealth has not appealed that ruling.

Court held that the ordinance was invalid because "reasonable nondiscriminatory alternatives, adequate to conserve legitimate local interests, [were] available." *Ibid.*

Boston has at its disposal reasonable alternatives to accomplish its central goal—the alleviation of unemployment among Boston residents. It can create training programs for its unemployed residents or establish aggressive referral practices aimed at promoting employment for its residents at *all* construction projects in the city without implicating Commerce Clause concerns. It also can undertake some of the construction projects itself, and hire Boston residents to work on them, without imposing discriminatory restraints on the private market.

Moreover, as in *Hicklin* v. *Orbeck*, 437 U. S. 518 (1978), the order is ill-suited to eliminating unemployment because it applies the preference to all Boston residents, not just the underemployed or undertrained. See *id.*, at 527–528. Finally, since *Dean Milk*, the Court has indicated that a discrimination against interstate commerce is unjustified unless there is a legitimate reason, apart from their out-of-state origin, to treat differently articles of commerce or individuals engaging in commerce originating outside the State. *Philadelphia* v. *New Jersey*, 437 U. S., at 626–627. No such reason has been shown in this case.

Insofar as the Massachusetts court held Boston's executive order violative of the Commerce Clause as applied outside the context of federal grant programs, I would affirm its judgment. To this extent, therefore, I respectfully dissent.