DENNIS, Circuit Judge,
concurring in part, dissenting in part:
I concur in the majority’s conclusion that Act 479 (the “Act”) is unconstitutional because it violates the Contracts Clause of the United States Constitution. I respectfully dissent, however, from the majority’s decision that the Act does not violate the Constitution’s dormant Commerce Clause.
The Act, on its face, explicitly discriminates against out-of-state health care insurers in order to protect in-state insurers from interstate commerce competition. The Act, in effect, erects a barrier to the sale of health care insurance in Louisiana by non-Louisiana health care insurers which seek to engage in interstate commerce in Louisiana. The state and the defendants have failed to show that the Act advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives. Therefore, the Act is facially invalid under the dormant Commerce Clause. Moreover, contrary to the majority’s decision, the Act is not exempt from dormant Commerce Clause scrutiny under the market participant exception, because it interferes with the natural functioning of the interstate market through prohibition and burdensome regulation. Accordingly, under the Supreme Court’s teachings, the district court’s judgment striking the Act as infringing upon the dormant Commerce Clause should be affirmed.
I.
The district court correctly determined that Act 479 violates the dormant Commerce Clause because it facially and effectively discriminates against Non-“Louisiana HMOs” that seek to engage in interstate commerce in Louisiana and the state has failed to demonstrate, or even allege, that it has no other means to advance a legitimate local interest.
The Supreme Court’s decisions establish “that the Commerce Clause not only grants Congress the authority to regulate commerce among the States, but also directly limits the power of States to discriminate against interstate commerce.” New Energy Co. of Ind. v. Limbach, 486 U.S. 269, 273, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988). This “negative” or “dormant” aspect of the Commerce Clause prohibits “ ‘economic protectionism — that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.’ ” Dep’t of Revenue of Ky. v. Davis, 553 U.S. 328, 128 S.Ct. 1801, 1808, 170 L.Ed.2d 685 (2008) (quoting New Energy Co., 486 U.S. at 273-74, 108 S.Ct. *633 1803); see also Granholm v. Heald, 544 U.S. 460, 472, 125 S.Ct. 1885, 161 L.Ed.2d 796 (2005) (“[S]tate laws violate the Commerce Clause if they mandate ‘differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.”’ (quoting Or. Waste Sys. Inc. v. Dep’t of Envtl. Quality of Or., 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994))). As a result, “[a] discriminatory law is ‘virtually per se invalid.’ ” Davis, 128 S.Ct. at 1808 (quoting Or. Waste Sys., 511 U.S. at 99, 114 S.Ct. 1345 (1994)). State statutes that discriminate against interstate commerce “are routinely struck down unless the discrimination is demonstrably justified by a valid” public purpose, “unrelated to economic protectionism.” New Energy Co., 486 U.S. at 274, 108 S.Ct. 1803 (citations omitted).
“This rule is essential to the foundations of the Union.” Granholm, 544 U.S. at 472, 125 S.Ct. 1885. The dormant Commerce Clause “effectuate[s] the Framers’ purpose to ‘prevent a State from retreating into the economic isolation’ ‘that had plagued relations among the Colonies and later among the States under the Articles of Confederation.’ ” Davis, 128 S.Ct. at 1808 (quoting Fulton Corp. v. Faulkner, 516 U.S. 325, 330, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996) and Hughes v. Oklahoma, 441 U.S. 322, 325-26, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979)) (other citations and alterations omitted). “The history of our Commerce Clause jurisprudence has shown that even the smallest scale discrimination can interfere with the project of our Federal Union.” Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me., 520 U.S. 564, 595, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997).
Act 479 violates the dormant Commerce Clause because on its face it discriminates against out-of-state HMOs by granting competitive advantages to “Louisiana HMOs”: (1) the Act requires the state Office of Group Benefits (“OGB”) to solicit bids from “Louisiana HMOs,” or “homegrown” HMOs,[1] La.Rev.Stat. Ann. § 42:802.1(A); (2) the Act further requires the OGB to offer up to three “competitive” insurance plans from “Louisiana HMOs” to state employees in each of nine in-state regions, id.; but (3) the Act does not require the OGB to solicit or offer state employees any plans issued by out-of-state HMOs, id.
Act 479 defines a “Louisiana HMO” as an insurer which: (1) offers fully-insured insurance products; (2) “[i]s domiciled, licensed, and operating within the state”; (3) “[mjaintains its primary corporate office and at least seventy percent [(70%)] of its employees in the state”; and (4) “[m]aintain[s], within the state, its core business functions which include utilization review services, claim payment processes, customer service call centers, enrollment services, information technology services, and provider relations.” La.Rev.Stat. Ann. § 42:802.1(C). Thus, to take advantage of the competitive advantages Act 479 grants “Louisiana HMOs,” an out-of-state insurance company must become a “Louisiana HMO” by meeting all of the foregoing criteria, including changing its domicile to Louisiana, moving its primary corporate office to Louisiana, hiring or relocating seventy percent (70%) of its employees so they are Louisiana residents, and relocating and maintaining all of its listed core business functions in Louisiana.
In this manner, the Act provides competitive advantages to “Louisiana HMOs” and reciprocal disadvantages to out-of-state HMOs. Unlike “Louisiana HMOs,” outsiders must incur extra overhead costs just to stay up to date on the state’s bidding and solicitation processes, as the OGB is not obliged to keep them informed of when bidding is occurring or the con *634 tents of any solicitation. Moreover, because the Act requires the OGB to accept virtually any competitive bid by a “Louisiana HMO,” but does not oblige it to accept any bid from a Non-“Louisiana HMO,” an out-of-state HMO’s cost-benefit analysis may prohibit it from competing with “Louisiana HMOs.” As the district court suggested, an out-of-state HMO’s direct competition with a “Louisiana HMO” is a “vain and useless act” because Act 479 requires that up to three competitive bids by “Louisiana HMOs” within each in-state region must be accepted, notwithstanding bids by Non-“Louisiana HMOs.” The Act guarantees that an outsider’s doing business in Louisiana is more risky and expensive and less profitable than the same business run by a “Louisiana HMO” in seeking to capture the same market.
Thus, Act 479 makes it virtually impossible for a Non-“Louisiana HMO” engaging in national, regional or multistate interstate business to compete with “Louisiana HMOs” in Louisiana. It is essential to companies doing business on a national or regional basis to achieve economies of scale by centralizing their core business functions or contractually outsourcing them to other interstate trading partners. For such a company to become a “Louisiana HMO,” and thereby to become competitive with “home-grown” “Louisiana HMOs,” would require it to drastically change its corporate mission and structure, abandon achieved economies of scale and sever contractual relations with its interstate trading partners. In effect, Act 479 dictates that an out-of-state insurance company engaged in interstate commerce on a national or regional basis simply cannot compete on an equal footing with “Louisiana HMOs.”
It is the Supreme Court’s concern about the “economic protectionism” of state laws like Act 479, viz., “regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors,” that has driven “[t]he modern law of what has come to be called the dormant Commerce Clause.” Davis, 128 S.Ct. at 1808. As the Supreme Court has specifically declared, a state violates the dormant Commerce Clause when it “require[s] an out-of-state firm ‘to become a resident in order to compete on equal terms’ ” with instate firms. Granholm, 544 U.S. at 475, 125 S.Ct. 1885 (quoting Halliburton Oil Well Cementing Co. v. Reily, 373 U.S. 64, 72, 83 S.Ct. 1201, 10 L.Ed.2d 202 (1963)).
Because Act 479 is discriminatory both on its face and in effect, “the virtually per se rule of invalidity provides the proper legal standard here, not the Pike [v. Bruce Church, Inc.] balancing test.” Or. Waste Sys., 511 U.S. at 100, 114 S.Ct. 1345. See also Pike, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).[2] As a result, the Act must be invalidated unless defendants can “ ‘sho[w] that it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.’ ” Or. Waste Sys., 511 U.S. at 100-01, 114 S.Ct. 1345 (1994) (alteration in original) (quoting New Energy Co., 486 U.S. at 278, 108 S.Ct. 1803) (citing Chemical Waste Mgmt., Inc. v. Hunt, 504 U.S. 334, 342-43, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992)). Thus, the Supreme Court requires “that justifications for discriminatory restrictions on commerce pass the ‘strictest scrutiny.’ ” Or. Waste Sys., 511 U.S. at 101, 114 S.Ct. 1345 (quoting Oklahoma, 441 U.S. at 337, 99 S.Ct. 1727). “The State’s burden of justification is so heavy that ‘facial discrimination by itself *635 may be a fatal defect.’ ” Or. Waste Sys., 511 U.S. at 101, 114 S.Ct. 1345 (quoting Oklahoma, 441 U.S. at 337, 99 S.Ct. 1727) (citing Westinghouse Elec. Corp. v. Tully, 466 U.S. 388, 406-07, 104 S.Ct. 1856, 80 L.Ed.2d 388 (1984) and Maryland v. Louisiana, 451 U.S. 725, 759-60, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981)).
Here, the state advances three justifications for the enactment of Act 479 and its discrimination against Non-“Louisiana HMOs” engaging in interstate commerce with the state, viz., “to provide State enrollees with more health care options,” to decrease costs and to “provide consistent health care benefits to State enrollees throughout the state.” Preston Taylor et al. Br. 22; Tommy D. Teague & Angele Davis Br. 19; Vantage Health Plan, Inc. Br. 28. Providing state employees and retirees with additional, competitively priced health care options and consistent benefits are certainly legitimate local purposes, but the state has not shown or even suggested why these purposes could not be adequately served by reasonable nondiscriminatory alternatives. Because the state has offered no legitimate reason for Act 479 to discriminate against Non-“Louisiana HMOs” or to prevent or hinder them from engaging in interstate business in Louisiana on an equal basis with “Louisiana HMOs,” the Act is facially invalid under the dormant or negative Commerce Clause.
II.
Act 479 should not be held to be immune from the limitations of the dormant Commerce Clause under the market participant exception. By Act 479, Louisiana regulates the interstate commerce activities of out-of-state Non-“Louisiana HMOs” by heavily burdening their competition with “Louisiana HMOs” for state contracts unless they become “Louisiana HMOs”; that is, unless they abandon their interstate, national, and regional operations based on economies of scale and become intra-state insurers with their bases of operations exclusively in Louisiana. Because the state through Act 479 thus interferes with the natural functioning of the interstate market by acting as a regulator and prohibitor of interstate insurance business, and not merely as an ordinary purchaser of insurance would act, it is not exempt from the limitations of the dormant Commerce Clause under the market participant exception.
In recognizing the market participant exception, the Supreme Court in Hughes v. Alexandria Scrap Corp. emphasized that the exception would not permit a state to “interfere[ ] with the natural functioning of the interstate market either through prohibition or through burdensome regulation.” 426 U.S. 794, 806, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976). To explain the exception, the Alexandria Scrap Court surveyed a number of cases in which it had found that states had unconstitutionally burdened interstate commerce through either prohibition or regulation:
In the most recent of those cases, Pike v. Bruce Church, [a] burden was found to be imposed by an Arizona requirement that fresh fruit grown in the State be packed there before shipment interstate. The requirement prohibited the interstate shipment of fruit in bulk, no matter what the market demand for such shipments. In H.P. Hood & Sons v. Du Mond, 336 U.S. 525 [69 S.Ct. 657, 93 L.Ed. 865] (1949), a New York official denied a license to a milk distributor who wanted to open a new plant at which to receive raw milk from New York farmers for immediate shipment to Boston. The denial blocked a potential increase in the interstate movement of raw milk. Appellee also relies upon Toomer v. Witsell, 334 U.S. 385 [68 S.Ct. 1156, 92 L.Ed. 1460] (1948), in which this Court found interstate commerce in raw *636 shrimp to be burdened by a South Carolina requirement that shrimp boats fishing off its coast dock in South Carolina and pack and pay taxes on their catches before transporting them interstate. The requirement increased the cost of shipping such shrimp interstate. In Foster-Fountain Packing Co. v. Haydel, 278 U.S. 1 [49 S.Ct. 1, 73 L.Ed. 147] (1928), a Louisiana statute forbade export of Louisiana shrimp until they had been shelled a[nd] beheaded, thus impeding the natural flow of freshly caught shrimp to canners in other States. Both Shafer v. Farmers Grain Co., 268 U.S. 189 [45 S.Ct. 481, 69 L.Ed. 909] (1925), and Lemke v. Farmers Grain Co., 258 U.S. 50 [42 S.Ct. 244, 66 L.Ed. 458] (1922), involved efforts by North Dakota to regulate and thus disrupt the interstate market in grain by imposing burdensome regulations upon and controlling the profit margin of corporations that purchased grain in State for shipment and sale outside the State. And in Pennsylvania v. West Virginia, 262 U.S. 553 [43 S.Ct. 658, 67 L.Ed. 1117] (1923), the Court found a burden upon the established interstate commerce in natural gas when a new West Virginia statute required domestic producers to supply all domestic needs before piping the surplus, if any, to other States.
Alexandria Scrap, 426 U.S. at 805-06, 96 S.Ct. 2488. “The common thread of all these cases,” the Court said, “is that the State interfered with the natural functioning of the interstate market either through prohibition or through burdensome regulation.” Id. at 806, 96 S.Ct. 2488. Further, the Court in Alexandria Scrap strongly reaffirmed that the dormant Commerce Clause “principle makes suspect any attempt by a State to restrict or regulate the flow of commerce out of the State. The same principle, of course, makes equally suspect a State’s similar effort to block or to regulate the flow of commerce into the State.” Id. at 808 n. 17, 96 S.Ct. 2488 (citing as “[s]ee, [e].g.,” Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935); Dean Milk Co. v. Madison, 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951); and Polar Ice Cream & Creamery Co. v. Andrews, 375 U.S. 361, 84 S.Ct. 378, 11 L.Ed.2d 389 (1964), and as “[s]ee generally” Great A&P Tea Co. v. Cottrell, 424 U.S. 366, 96 S.Ct. 923, 47 L.Ed.2d 55 (1976)).
Louisiana and the majority, in refusing to recognize that Act 479 facially runs afoul of this near century of precedents, struggle mightily to analogize the instant case to White v. Massachusetts Council of Construction Employers, Inc., 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983), and to distinguish it from the Court’s most elaborate market participant analysis in South-Central Timber Development, Inc. v. Wunnicke, 467 U.S. 82, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984) (plurality opinion of White, J.). But neither of these cases can properly be invoked to shield Act 479 from the rigorous scrutiny called for by the dormant Commerce Clause.
In White, the Supreme Court upheld against a dormant Commerce Clause challenge a mayoral order that required, for construction projects funded by the city, that at least half of contractors’ workforces be Boston residents. The order placed no other demands relevant to the Commerce Clause on the contractors seeking to do business with the city. See White, 460 U.S. at 205-06 & n. 1, 103 S.Ct. 1042. The Court explained that unlike prior unconstitutional statutes, the mayoral order did not “ ‘attempt to force virtually all businesses that benefit in some way from the economic ripple effect’ ” of the city’s construction contracts “ ‘to bias their employment practices in favor of the [city’s] residents.’ ” Id. at 211 & n. 7, 103 S.Ct. 1042 (alteration *637 in original) (quoting Hicklin v. Orbeck, 437 U.S. 518, 531, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978)). However, in contrast with the mayoral order in White, Act 479 not only requires that out-of-state HMOs must employ seventy percent (70%) Louisiana workers, it also “attempt[s] to govern the private, separate economic relationships of [Non-‘Louisiana HMOs’ and their] trading partners.” South-Central Timber, 467 U.S. at 99, 104 S.Ct. 2237. Act 479 demands that, to be competitive, out-of-state insurers must become “Louisiana HMOs” by becoming domiciled in Louisiana, relocating their bases of operations there, and altering their internal structure and operations so as to become vertically integrated, having all of their core business functions in Louisiana, thereby abandoning their centralized national or regional operations, interstate outsourcing and economies of scale.
Further, in White the Court explained that “there are some limits on a state or local government’s ability to impose restrictions that reach beyond the immediate parties with which the government transacts business,” but the Court declared it unnecessary “to define those limits” in that case because “[e]veryone affected by the order [was], in a substantial if informal sense, ‘working for the city.’ ” 460 U.S. at 211 n. 7, 103 S.Ct. 1042. See also South-Central Timber, 467 U.S. at 95, 104 S.Ct. 2237 (“The fact that the employees were ‘working for the city’ was ‘crucial’ to the market-participant analysis in White.” (quoting United Bldg. & Constr. Trades Council v. Mayor of Camden, 465 U.S. 208, 219, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984))); Nat’l Foreign Trade Council v. Natsios, 181 F.3d 38, 63 (1st Cir.1999) (White “did not involve an attempt by Boston to require all contractors with the city to employ Boston residents in all of their other projects, a situation more akin to this case. Here, Massachusetts is attempting to impose on companies with which it does business conditions that apply to activities not even remotely connected to such companies’ interactions with Massachusetts.”).
Act 479’s regulatory impact affects more than just the state’s contracts with HMOs. It significantly interferes with the natural functioning of the interstate insurance market by imposing restrictions upon out-of-state companies seeking to do business in Louisiana. Further, under Act 479, those restrictions can be alleviated only by transforming out-of-state companies into “Louisiana HMOs” with the relocation of their domiciles, base of operations, seventy percent (70%) of their workforce, and all of their core business functions to Louisiana. Thus, Act 479 reaches beyond the parties’ privity in state insurance contracts to also regulate out-of-state insurers’ relationships with their non-Louisiana employees, their non-Louisiana corporate affiliates, and their non-Louisiana trading partners handling their outsourced core business functions.
Finally, the majority’s attempt to distinguish South-Central Timber — the Supreme Court’s most detailed articulation of the market participation exception — is unsuccessful. In fact, South-Central Timber is closely analogous to the present case and demonstrates that the market participant exception cannot salvage Act 479 because it impermissibly regulates interstate markets in which Louisiana is not a participant.
In South-Central Timber the Supreme Court held that the state of Alaska, as a seller of timber, could not require that timber from state lands be processed within the state before being exported. 467 U.S. at 84, 104 S.Ct. 2237. The Court recognized that Alaska was a market participant with respect to selling timber, but found that its statute was unconstitutional because the state was not participating in *638 other aspects of the timber industry, such as processing. Id. at 98, 104 S.Ct. 2237. The Court explained that while Alaska could “choos[e] its own trading partners,” it could not “attempt! ] to govern the private, separate economic relationships of its trading partners.” Id. at 99, 104 S.Ct. 2237. Such conduct was an impermissible effort to alter the “vertical” structure of the industry. Id. at 98, 104 S.Ct. 2237. The Court emphasized that “the [market-participant] doctrine is not carte blanche to impose any conditions that the State has the economic power to dictate, and does not validate any requirement merely because the State imposes it upon someone with whom it is in contractual privity.” Id. at 97, 104 S.Ct. 2237. Instead, the test for whether the state is a market participant is “whether [the state] is acting as an ordinary market participant would act.” Nat’l Foreign Trade Council, 181 F.3d at 65 (emphasis added).
Contrary to the majority’s protestations, as in South-Central Timber, Act 479 impermissibly “attempts] to govern the private, separate economic relationships of its trading partners.” 467 U.S. at 99, 104 S.Ct. 2237. Act 479 dictates that to compete on an even playing field with “Louisiana HMOs,” Non-“Louisiana HMOs” must change the location at which they maintain their utilization review services, claim payment processes, customer service call centers, enrollment services, information technology services, and provider relations, all of which, in this modern economy, are likely outsourced to third parties. Thus, Act 479 reaches outside the market in which the state participates and attempts to regulate and interfere with markets and relationships in which the state does not participate, viz., the relationships and markets between Non-“Louisiana HMOs” and their third party trading partners, such as information technology services companies. Thus, the Act also attempts to alter the vertical structure of Non-“Louisiana HMOs” by requiring them to incorporate and relocate core business functions to Louisiana.
An “ordinary” market participant is concerned with the price and quality of the product and services purchased, rather than with having a company’s trading partners located within a particular state. See South-Central Timber, 467 U.S. at 98, 104 S.Ct. 2237 (“[S]imply as a matter of intuition a state market participant has a greater interest as a ‘private trader’ in the immediate transaction than it has in what its purchaser does with the goods after the State no longer has an interest in them.”). One insurance company witness testified, and we can take judicial notice, that national and regional insurers create economies of scale by centralizing or outsourcing many of their services, which results in lowering the cost of insurance. Accordingly, Act 479’s mandate that Non-“Louisiana HMOs” reconstitute themselves and their trading partners as integrated intra-state entities in order to compete fairly with “Louisiana HMOs” for the state’s business demonstrates that the state is not acting as an ordinary market participant. The Supreme Court has clearly “rejected] the contention that a State’s action as a market regulator may be upheld against Commerce Clause challenge on the ground that the State could achieve the same end” if it were a market participant in each of the affected markets. Id. at 98-99, 104 S.Ct. 2237.
“The limit of the market-participant doctrine must be that it allows a State to impose burdens on commerce within the market in which it is a participant, but allows it to go no further. The State may not impose conditions, whether by statute, regulation, or contract, that have a substantial regulatory effect outside of that particular market.” South-Central Timber, 467 U.S. at 98, 104 S.Ct. 2237. More *639 over, the “market” in which the state is participating must be “narrowly defined,” or the market participant exception will erode the dormant Commerce Clause. Id. at 99,104 S.Ct. 2237.
Thus, Louisiana can impose conditions on its purchase of insurance that an ordinary market participant would, so long as the “insurance market” which the conditions affect is narrowly defined. But it cannot by statute impose conditions that have a substantial regulatory effect outside of that particular market. By Act 479, Louisiana goes beyond participating in a market as would an ordinary purchaser of insurance. Rather, Act 479 imposes conditions that have substantial, even prohibitive, regulatory effects outside of the market in which the state participates as an insurance purchaser. Act 479 requires out-of-state insurers, in order to fairly compete for the state’s business, to relocate their domiciles, operating bases, workforces, and core business functions in Louisiana. These statutory effects would interfere with and regulate the insurers’ relationships and markets with their third-party trading partners in interstate commerce. Consequently, Louisiana’s actions under Act 479 having such regulatory effects are not entitled to the market participant exception from the dormant Commerce Clause.
For these reasons, in my view, the judgment of the district court holding Act 479 invalid as a violation of the dormant Commerce Clause should be affirmed.

. Majority Op. 625-66.

. "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.” Pike, 397 U.S. at 142, 90 S.Ct. 844.