# Constitutionality of South African Divestment Statutes Enacted by State and Local Governments

In response to conditions in South Africa, a number of state and local governments passed statutes or ordinances requiring the divestment of pension funds from companies that do business in South Africa or prohibiting governmental bodies from entering into contracts with such companies. The divestment laws survive constitutional scrutiny.

The divestment laws do not place an impermissible burden on foreign commerce. Under the market participation doctrine, the Supreme Court has held that proprietary, as opposed to governmental, actions of state and local governments may be shielded from the strictures of the Commerce Clause. The divestment laws fall within that doctrine. Nor do such laws represent an unconstitutional interference with the federal government's foreign affairs power. Finally, such laws are not preempted by either the Export Administration Act or Executive Order No. 12532, which imposes certain economic sanctions on South Africa.

April 9, 1986

MEMORANDUM OPINION FOR THE ASSOCIATE ATTORNEY GENERAL

This memorandum addresses the question whether certain state and local divestment laws are subject to constitutional challenge. These laws vary in their scope, but their general characteristics are that they either (a) require the divestment of state or local employee pension funds from companies which do business in South Africa;[1] or (b) restrict or prohibit a city or a state from entering into contracts with companies that have investments, licenses, or operations in South Africa.[2] We are not aware of state or local statutes that seek directly to regulate the activities of companies doing business in South Africa. This memorandum is therefore limited to evaluating the constitutionality of statutes in which the state exercises its proprietary authority to invest funds under its control and to award city financed contracts in a manner that discriminates against companies with South African operations.[3]

---

[1] See, e.g., 1985 New Jersey Laws, Act 308 (directing that the state treasurer not invest pension funds under state control in any institution which has outstanding loans to the Republic of South Africa, or in the stocks, securities or other obligations of any company engaged in business in the Republic and directing that such existing investments be divested within three years); Rhode Island General Laws Chapter 35–10 (requiring divestment of state funds and pension funds invested in any financial institution lending money to or any corporation doing business in South Africa).

[2] See, e.g., New York City Local Law 19 (1985) (imposing certain conditions relating to South Africa on companies bidding for city contracts).

The rationales offered for the divestment statutes are also varied. The legislative intent of the New Jersey law is "to encourage retreat by companies essential to the economy of South Africa and thus encourage it to alter its ways." Op. N J. Att'y Gen. (Dec. 19, 1985). In contrast, the stated purpose of Michigan's law is to achieve the state's goal of ending discrimination Our discussion will apply to all divestment statutes, whatever the intent with which they were passed, except when we indicate otherwise.

[3] Such statutes will be referred to collectively in this memorandum as "divestment statutes."

49

These statutes may be subject to constitutional challenge on the grounds (1) that state divestment legislation is an impermissible burden on foreign commerce; (2) that such legislation constitutes an impermissible intrusion into a field, foreign affairs, that is uniquely the concern of the federal government; and (3) that the state and local statutes are preempted either by Executive Order No. 12532, which prohibits certain transactions with South Africa, or by the Export Administration Act, which declares that free trade is, in general, the policy of the United States.

Although each of these challenges presents a complex legal issue, we believe that state divestment statutes of the type described above are constitutional. First, we believe that a Commerce Clause challenge to divestment statutes would, and should, fail. In developing what has come to be known as the market participant doctrine, the Supreme Court has distinguished, quite properly, between the exercise of proprietary powers — powers which are not unique attributes of sovereignty, but rather are held in common with other persons and entities — and regulatory power — power to impose regulations pursuant to the sovereign power to govern. The Court has shielded proprietary actions from the strictures of the Commerce Clause. State divestment statutes represent, we believe, an exercise of proprietary power to spend or invest state funds in a manner that reflects their citizens' moral sentiments or economic interests, and accordingly ought to escape invalidation under the Commerce Clause.[4]

Nor do these statutes violate any specific prohibition against state intrusion into the area of foreign affairs imposed by Article I, § 10 of the Constitution, such as the prohibition against entering into treaties with foreign nations. While the Supreme Court has suggested that a general principle against state intrusion into foreign affairs, a principle going beyond these specific textual prohibitions, may be derived from the federal government's extra-constitutional sovereignty, this principle has never been applied to a state's exercise of proprietary powers. Indeed, the Court has applied this principle to a state statute only once. In *Zschernig* v. *Miller*, 389 U.S. 429 (1968), the Court struck down a probate law that permitted state courts to inquire into the operation of foreign law, to evaluate the credibility of foreign officials, and to engage in persistent criticism of foreign countries in order to deny citizens of those nations' American legacies. Because the Court has upheld state regulatory statutes that have an indirect impact on foreign affairs, we believe that this single case represents the Court's reaction to a particular regulatory statute, the operation of which intruded extraordinarily deeply into foreign affairs. It does not imply that the Court would strike down regulatory statutes having a less direct impact on foreign affairs. In any event, the principle in *Zschernig* should not be extended to invalidate exercises of state proprietary, as opposed to regulatory, powers.

---

[4] Although the Court expressly reserved the question of whether the market participant doctrine applies to the state statutes that affect foreign, as opposed to interstate, commerce, we believe that the rationale for the distinction — that the Commerce Clause was intended to restrict a state's ability to regulate but not its ability to participate in markets — applies equally to statutes that affect foreign commerce.

Finally, under ordinary preemption analysis, Executive Order No. 12532 and the Export Administration Act do not preempt state regulation of trade with South Africa. Neither the Order nor the Act represents a comprehensive scheme to regulate trade with South Africa, nor do they reflect an intent to displace the state's traditional authority to invest its funds and make contracts as it chooses.

## I. The Commerce Clause

The Supreme Court has shielded state proprietary activity from the strictures of the Commerce Clause under the market participation doctrine. The first case to enunciate the market participant analysis was *Hughes* v. *Alexandria Scrap Corp.*, 426 U.S. 794 (1976).[5] There the Court upheld a Maryland program of paying a bounty for recycling abandoned cars (hulks) formerly titled in Maryland. To receive a bounty under the program, scrap processors were required to submit title documentation, but the documentation requirements for Maryland processors were more lenient than those for non-Maryland processors. Distinguishing cases in which it had invalidated state statutes that had "interfered with the natural functioning of the interstate market through prohibition or through burdensome regulation," 426 U.S. at 806, the Court noted that Maryland neither prohibited nor regulated the sale of hulks, but rather was acting as a "market participant to bid up their price." *Id.* The Court concluded that "[n]othing in the purposes animating the Commerce Clause prohibits a state, in the absence of congressional action, from participating in the market and exercising its right to favor its own citizens over others." *Id.* at 810.[6]

---

[5] The proprietary/regulatory distinction, however, is not of recent vintage or limited to Commerce Clause analysis, but appears in other areas of Supreme Court jurisprudence. In *Atkin* v. *Kansas*, 191 U.S. 207 (1903), the Court dismissed a challenge to a statute requiring contractors hired by a state agency to limit their employees to an eight-hour day. The Court stated:

> [W]e can imagine *no possible ground* to dispute the power of the state to declare that no one undertaking work for it or for one of its municipal agencies should permit or require an employee on such work to labor in excess of eight hours each day, and to inflict punishment upon those who are embraced by such regulations and yet disregard them. It cannot be deemed a part of the liberty of any contractor that he be allowed to do public work in any mode he may choose to adopt, without regard to the wishes of the state. *On the contrary, it belongs to the state, as the guardian and trustee for its people, and having control of its affairs, to prescribe the conditions upon which it will permit public work to be done on its behalf, or on behalf of its municipalities.*

191 U.S. at 222 (first emphasis added; other emphasis in original). The emphasis in *Atkin* on proprietary powers was of great significance, because two years later in *Lochner* v. *New York*, 198 U.S. 45 (1905), the Court, composed of the same members, invalidated under the Due Process Clause of the Fourteenth Amendment a statute in which the state exercised its regulatory powers to prohibit employing a baker for more than sixty hours a week.

In 1972 the Court summarily affirmed a lower court ruling that permitted the state of Florida to favor Florida-based publishing houses in purchases of school textbooks. *See American Yearbook Co.* v. *Askew*, 339 F. Supp. 719 (M.D. Fla.), *aff'd*, 409 U.S. 904 (1972).

[6] In enacting state divestment statutes, states are not acting to favor their own citizens *over* others. Instead state divestment decisions are intended to advance the moral or economic interests of its citizens. Since their inception states have legislated to reflect the moral sentiments of their communities, and we find nothing in logic or case law to suggest that the representation of community sentiments may not be a legitimate basis for state investment or contractual decisions, particularly in an area in which the Supreme Court has acknowledged that the state is acting as a "guardian and trustee of its people." *Reeves, Inc.* v. *Stake*, 447 U.S. 429, 483 (1980).

Continued

51

In *Reeves, Inc.* v. *Stake*, 447 U.S. 429 (1980), the Court upheld South Dakota's right to restrict the sale of state-produced cement to state residents. The Court not only affirmed the market participant doctrine in *Alexandria Scrap* as "good sense and sound law," but expanded on its rationale. Noting that the Commerce Clause was not intended "to limit the ability of the States themselves to operate freely in the free market," the Court emphasized that "restraint in this area is counseled by considerations of state sovereignty, 'the role of each state as guardian and trustee of its people.'" *Id.* at 437–38 (quoting *Atkin* v. *Kansas*, 191 U.S. 207, 222–23 (1903)). The Court also suggested that in light of "the long recognized right of a trader or manufacturer, engaged in an entirely private business, freely to exercise his own independent discretion as to the parties with whom he will deal," states acting in a proprietary capacity "similarly share existing freedoms from federal constraints, including the inherent limits of the Commerce Clause." *Id.* at 438–39 (citations omitted).

In its most recent majority opinion on the market participant doctrine in the Commerce Clause, the Court again reaffirmed that "when a state or local government enters the market as a participant it is not subject to the restraints of the Commerce Clause." *White* v. *Massachusetts Council of Constr. Employers, Inc.*, 460 U.S. 204, 210 (1983). In that case the Court upheld a city order requiring each contractor on city financed or city administered construction projects to employ Boston residents in numbers equal to at least fifty percent of its total workforce. The Court was unmoved by the dissenters' arguments that by imposing these requirements the city was taking action that was indistinguishable from regulating the employment market between private contractors and their labor force.[7]

The reasoning of these opinions, and in particular the rationales articulated in *Reeves* for the market participant doctrine, logically extend to state divestment statutes and, in our view, shield them from scrutiny under the Commerce Clause. While the Court has not defined the exact scope of the market participation doctrine, *see infra* Part I.B., and has therefore not fully developed a test to distinguish between a state's regulatory and proprietary powers, we believe

---

[6] (. . . continued)

Indeed, it would be peculiar to assert that the market participant doctrine is limited to shielding actions in which the state is trying to discriminate against other citizens in favor of its own. In light of the holding that local legislation which intends to discriminate against citizens of other states for the benefit of its own citizens is "almost *per se* illegal" under the Commerce Clause, *Pike* v. *Bruce Church, Inc.*, 397 U.S. 137, 145 (1970), the state action protected in *Hughes* would seem more problematic than state action in the market that is taken without any intent to discriminate for the economic benefit of its own citizens.

[7] In *White*, the Court did agree that there are some limits "on a state's ability to impose restrictions that reach beyond the immediate parties with which the government transacts business," 460 U.S. at 211 n.7, but declined to identify those limits. For the reasons stated in Part I.A., we believe that state divestment legislation falls within any principled limitation to the doctrine. Some commentators believe that the principled limit to the government's ability to impose restrictions arises when the government has monopoly power in the market in which it participates. If the government does have monopoly power it has a coercive power to impose conditions on third parties that is hard to distinguish from the coercive power to regulate that it possesses as a sovereign. If it does not possess monopoly power, its power to impose conditions is not different in kind from private entity. *See* Gillien, *A Proposed Model of the Sovereign/Proprietary Distinction*, 133 U. Pa. L. Rev. 661, 680 (1985) (proposing to distinguish between proprietary and sovereign power by determining whether power is "coercive").

that, given the rationale for the distinction, state divestment statutes are plainly proprietary in nature. In refusing to invest its funds in or contract with corporations doing business in South Africa, a state is exercising the prerogatives and the powers that any private person or entity enjoys as a matter of contract and property rights. The state is not employing the sovereign power that it uniquely enjoys in its jurisdiction to compel action under the threat of punishment. All corporations doing business in jurisdictions that have passed divestment statutes continue to be entirely at liberty to do business in South Africa.[8]

Notwithstanding the fact that the state divestment statutes at issue here are clearly within the logic of the market participation doctrine, there is language in some of the cases suggesting limitations on the doctrine's applicability in this area. First, the *Reeves* Court noted that "Commerce Clause scrutiny may well be more rigorous when a restraint on foreign commerce is alleged," and expressly reserved the issue of whether the market participation doctrine applies to foreign commerce. 447 U.S. at 437–38 n.9.[9] Second, in *South Central Timber Dev., Inc.* v. *Wunnicke*, 467 U.S. 82 (1984), a plurality of the Court refused to apply the market participation doctrine to a state requirement that purchasers of state-owned timber process the timber in mills located in the state. Distinguishing between the market for the sale of timber and the market for the processing of timber, the plurality stated that the state's participation in the former did not permit it to impose "downstream restrictions" in the latter. 467 U.S. at 99. Finally, in *Wisconsin Dep't of Industry, Labor, and Human Relations* v. *Gould, Inc.*, 475 U.S. 282 (1986), the Court held that the National Labor Relations Act (NLRA) preempted a Wisconsin statute forbidding certain repeat violators of the NLRA from doing business with the state. In the course of that opinion, the Court stated the state statute was "tantamount to regulation." *Id.* at 289.

For the reasons that follow, we believe that the market participant doctrine applies to state proprietary activity affecting foreign as well as interstate commerce and that the state divestment laws at issue here are constitutional exercises of the states' proprietary authority.

## A. The Application of the Market Participation Doctrine to the Foreign Commerce Clause

The rationales underlying the market participant doctrine apply no less to the Foreign than to the Interstate Commerce Clause. The historical evidence no more suggests that the Commerce Clause was intended to limit the ability of states to purchase goods (including securities) and services in the marketplace when their operations indirectly affect foreign commerce than it indicates such

[8] Although the Supreme Court has not yet addressed any case in which the state acts as investor rather than a buyer or seller in a market, we believe that rationales given for the doctrine apply to the state as an investor as well as to the state as a buyer or seller. An investor, at bottom, is simply a purchaser of securities.

[9] The plurality opinion in *South Central Timber, infra*, also supports its position that Alaska's restrictions on the timber market are invalid by reference to the stricter scrutiny under the Foreign Commerce Clause. 467 U.S. at 100.

an intent when their operations affect domestic commerce. To be sure, statements of the Framers suggest that they were more immediately concerned with state restrictions on foreign commerce than on interstate commerce.[10] Consequently, it may be plausibly, although not indisputably, argued that Congress was given "a larger range of action" over foreign than over interstate commerce. *See* Abel, *supra* note 10, at 465–75.[11] But nothing in the historical record suggests that the Framers were concerned with state *proprietary* actions affecting either foreign or interstate commerce.[12] To the contrary, the Commerce Clause was designed by the Framers to address the problems caused by exercises of state regulatory power, generally the power to impose imposts and taxes on commerce. *See* U.S. Const. art. I, § 10, cl. 2; *see also The Federalist* No. 42, at 267–68 (C. Rossiter ed., 1961). *See generally* Abel, *supra* note 10, at 465–75 (citing Framers' discussions of the types of state activities that Commerce Clause was designed to prevent).[13]

The other rationales for the market participation doctrine cited by *Reeves* also apply to participation affecting foreign commerce. The role of the state as "guardian and trustee for its people" in spending or investing their funds is as strong when the state's market participation affects foreign as when it affects interstate commerce. The right of a trader or manufacturer to deal with whom

[10] At the Constitutional Convention, state action affecting interstate commerce was mentioned only nine times, while the framers issued a "proliferation of statements . . . where commerce was discussed in a context specifically pointing to foreign commerce." Abel, *The Commerce Clause in the Constitutional Convention and in Contemporary Comment*, 25 Minn. L. Rev. 432, 470 (1941).

[11] James Madison himself suggested that the interstate commerce power was of a purely "negative" character and, unlike the power over foreign commerce, was not to be used "for the positive purposes of government." Letter of Feb. 13, 1829 to J.C. Cabell, 3 Farrand, *The Records of the Federal Convention of 1787* 478 (1966). For a contrasting view of the historical evidence, *see* Corwin, *The Commerce Power Versus State Rights* ix (1936) ("In 1789 Congress was deemed to have the same power over commerce among the states as over that with foreign nations, the same right to restrain the other for what it thought to be the good of the country").

[12] It may be argued that at the time of the drafting and ratification of the Constitution that there was no distinction made between proprietary activity and regulatory powers of states. The Supreme Court, however, has implicitly endorsed a distinction between proprietary and regulatory powers as a mater of original intent. In *Reeves*, the Court noted that it was no part of the "constitutional plan to limit the ability of states themselves to operate freely in the free market." *Reeves*, 429 U.S. at 437 (1980). Such a distinction, while not discussed at the Convention or in the Federalist Papers, was plainly understood at the time of the drafting of the Constitution. In 1787, as today, states engaged in marketplace activity that was indistinguishable from that of private entities. They also exercised uniquely sovereign power to regulate the conduct of persons within their jurisdictions. That discussions of the Commerce Clause invariably centered on the latter type of power is therefore significant.

[13] In *The Federalist*, Alexander Hamilton wrote that:
The principal purposes to be answered by the union are these — the common defense of the members; the preservation of the public peace, as well against internal convulsions and external attacks; regulation of commerce with other nations and between the states; the superintendence of our intercourse, political and commercial with foreign countries.
*The Federalist* No. 23, at 153 (C. Rossiter ed. 1961). In *The Federalist* No. 22, Hamilton discusses the need for federal "superintendence" at length. His concern is evidently that states will erect tariffs in contravention of agreements entered into by the national government. *See The Federalist* No. 22, at 144 (C. Rossiter ed. 1961) ("No nation acquainted with the nature of our political association would be unwise enough to enter into stipulations with the United States, conceding on their part privileges of importance, while they were apprised that the engagements on the part of the Union might at any time be violated by its members. . . ."). The concern that states will impose tariffs in violation of national agreements is obviously quite distant from the concern that states will refuse to invest in American companies that do business in a foreign country.

he chooses is as great when his decision affects foreign as when it affects interstate commerce. Therefore, we believe that the rationale for the market participation doctrine ineluctably leads to the conclusion that when a state or local government enters the market as a participant it is not subject to the restraints of the Commerce Clause, whether Foreign or Interstate.

*Japan Line, Ltd.* v. *County of Los Angeles*, 441 U.S. 434 (1979), the most recent authority for the proposition that scrutiny is stricter under the Foreign Commerce Clause, does not suggest the contrary. In that case, the Supreme Court struck down a state *ad valorem* tax assessed on shipping containers within the state which were used exclusively in foreign commerce. The Court did not dispute that the tax might be constitutional if applied to containers used in interstate commerce, but held that a "more extensive inquiry is required" when a regulation affects foreign commerce. 441 U.S. at 445–46. To justify its strict scrutiny, the Court first noted that the tax resulted in multiple taxation of the instrumentalities of foreign commerce. Second, the Court determined that the tax at issue interfered with the ability of the nation to pursue a uniform policy in light of a treaty with Japan that forbade the taxation of containers.

*Japan Lines* does not address the issue of whether the Commerce Clause applies to a state's action as a market participant. One of the rationales for the decision — the danger that states may subject foreigners to multiple regulation or taxation — clearly does not apply to state divestment statutes. As we will discuss in Part III, the national interest in uniformity is not impaired by these divestment statutes, because no statute or treaty purports to regulate proprietary decisions with respect to doing business with companies that operate in South Africa.

More recently, in *Container Corp.* v. *Franchise Tax Bd.*, 463 U.S. 159 (1983), the Court distinguished *Japan Lines* and upheld a unitary tax on the subsidiaries of foreign corporations, noting that no statute or treaty prohibited the tax, and that the risk of retaliation seemed slight. The Court stated that while it would review the state tax at issue, it had "little competence in determining precisely when foreign nations will be offended by particular acts, and even less competence in deciding how to balance a particular risk of retaliation against the sovereign right of the United States as a whole to let the states tax as they please." *Id.* at 194. Such sentiments confirm our conclusion that courts would be justifiably reluctant to strike down an exercise of state proprietary power on account of potential interference with foreign affairs when Congress and the President have not acted to prohibit state divestment statutes.

## B. Possible Restrictions on the Scope of the Market Participant Doctrine

In *South-Central Timber Dev., Inc.* v. *Wunnicke, supra,* four Justices suggested that they would restrict the scope of the market participant doctrine.[14]

---

[14] Justice White wrote the plurality opinion; he was joined by Justices Brennan, Blackmun and Stevens. Justice Rehnquist, joined by Justice O'Connor, dissented from the plurality's views on the issue of whether Alaska was acting as a market participant, stating that the market participant doctrine should shield the
Continued

They refused to uphold an Alaskan statute which required that timber purchased from Alaska be processed in the state. The plurality opinion sharply distinguished the market for timber sales and the market for timber processing and stated that Alaska's participation in the former market did not immunize from Commerce Clause scrutiny restrictions imposed "downstream" on the latter market. 467 U.S. at 98–99. Citing the law on restraints on alienations, the plurality opinion first reasoned that the market participant doctrine should not apply because a state as a private trader intuitively has a "greater interest as a 'private trader' in the immediate transaction than it has in what its purchaser does with the goods after the State no longer has an interest in them." *Id.* at 98. Second, the Court stated that "downstream restrictions" have greater regulatory effect than limitations on the immediate transaction." *Id.*

We believe that even were *South-Central Timber* a majority holding, it would not prevent the application of the market participation doctrine to state divestment statutes. The requirements that the state divestment statutes impose on those who contract with or receive investment capital from the state are more like the requirements imposed on construction firms in *White* v. *Massachusetts Council of Constr.*, *supra*, than the requirements imposed by Alaska on buyers of timber. The state divestment statutes do not attach continuing conditions on the use of a natural resource once that resource passes out of the control of the states and into the hands of a private trader. Instead these statutes impose conditions precedent on companies who are competing for state contracts or investments. They thus are not comparable to restraints on alienation.

Nor do we believe that state divestment statutes generally constitute regulation because of their "downstream effects" in a market in which the state is not a market participant. The plurality opinion in *South-Central Timber* rested on the finding that Alaska was not a participant in the timber processing market. According to Justice White, Alaska's contractual condition demanding that its timber be processed in-state was therefore to be scrutinized for regulatory effects. In contrast, state divestment statutes do not impose conditions in markets in which the state is not participating. For instance, in refusing to buy computers from a certain computer manufacturer, the state is acting in a way that affects the market for computers — a market in which it is *ex hypothesi* a participant. In refusing to invest in the computer company, the state is simply affecting the market for securities — a market in which the state is participating as an investor.[15]

---

[14] (. . . continued)

Alaskan statute from Commerce Clause scrutiny. Chief Justice Burger and Justice Powell dissented, arguing that the court should remand the case to the Ninth Circuit to permit that court to consider the market participant issue. Justice Marshall did not participate.

[15] Although the plurality opinion does not fully explicate the reasons that the imposition of this particular contractual condition caused "downstream effects" amounting to regulation, a plausible rationale would be that Alaska has monopoly power in the Alaskan timber market. This would be consistent with the argument of some commentators that a state should be treated as a regulator when it exercises monopoly power. *See supra* note 7. Because of its monopoly position, Alaska was in a position to coerce the contractors in a manner that is difficult to distinguish from the coercive effect of sovereign regulatory power. The conditions required by

Continued

The plurality opinion in *South-Central Timber*, however, is not binding precedent, and we believe that not all of its reasoning flows logically from the structure of the market participation doctrine. Wherever the state exercises its power as a buyer or investor to impose some contractual term on a company with which it deals, it is acting as in its proprietary rather than regulatory capacity. The kind of contractual condition the state chooses to impose should not affect the application of the market participation doctrine, given the rationales supporting the doctrine. In imposing requirements on companies with which it is doing business, the state is still acting as "a guardian and trustee of its people," *Reeves*, 447 U.S. at 438, and is still acting with the freedom permitted private businesses in the absence of state or federal legislation to the contrary. Thus, the legality of the state's contractual condition is more logically evaluated under legal provisions, which Congress has enacted to regulate exercises of proprietary power, than under the Commerce Clause. *See South-Central Timber*, 467 U.S. at 102–03 (Rehnquist, J., dissenting). Therefore we believe that if the Court follows the sound logic of its majority opinions interpreting the market participation doctrine, the South African divestment statutes will be upheld.

Finally, it may be argued that in *Wisconsin Dep't of Industry, Labor and Human Relations* v. *Gould, Inc.*, 475 U.S. 282 (1986), the Supreme Court implicitly restricted the scope of the market participant doctrine in Commerce Clause analysis. In that case, the Supreme Court held that the National Labor Relations Act (NLRA) preempted a Wisconsin statute, which suspended Wisconsin's business dealings with persons or firms who had violated the NLRA three times within a 5–year period. The Court reasoned that because the Wisconsin debarment statute functioned as a supplemental sanction for violations of the NLRA, it conflicted with the National Labor Relations Board's comprehensive regulation of industrial relations in the same way as would a state prohibition on private parties doing business with repeat labor law violators. Thus the holding in *Gould* rests explicitly on the preemptive force of the NLRA and is not premised in any way on the dormant Commerce Clause.

Nevertheless, in response to the argument that preemption analysis was inappropriate, the Court briefly discussed the market participation doctrine only to dismiss it as inapposite. It held that "the market participant doctrine reflects the particular concerns underlying the Commerce Clause, not any general notion regarding the necessary extent of state power in *areas where Congress has acted.*" *Id.* at 289 (emphasis added). Emphasizing that "what the Commerce Clause would permit States to do in the absence of the NLRA is thus an entirely different question from what the States may do with the Act in

---

[15] Continued

the divestment statutes, however, are not imposed from a position of monopoly power No state approaches having monopoly power in the capital markets and therefore state statutes directing the manner of the investment of their funds are in no sense coercive. Moreover, because states rarely have monopoly power m markets in which they purchase goods and services, most divestment statutes which take the form of refusing to contract with companies doing business with South Africa are readily distinguishable from *South-Central Timber*.

57

place," the Court held that in passing the NLRA, Congress intended to prohibit the states from interfering in any way with the "interrelated federal scheme of law, remedy, and administration." *Id.* (citations omitted).

The only support for arguing that *Gould* restricted the scope of the market participation doctrine in the Commerce Clause comes from a single sentence at the start of the Court's discussion of the applicability of the doctrine to preemption analysis under the NLRA:

> We agree with the Court of Appeals, however, that by flatly prohibiting state purchases from repeat labor law violators, Wisconsin "simply is not functioning as a private purchaser of services," 750 F.2d at 614; for all practical purposes, Wisconsin's debarment scheme is tantamount to regulation.

*Id.* We do not read this sentence as indicating that the Supreme Court would consider a refusal to contract with companies doing business in South Africa to be regulation under the Commerce Clause.

First, the most logical interpretation of this sentence is that the Court viewed the Wisconsin statute as regulation because the statute specifically linked the state's decisions to violations of the NLRA, a federal *regulatory* scheme. This reading is supported by the Court's citation to the appellate court's opinion, which in its discussion of preemption stated:

> Wisconsin simply is not functioning as a private purchaser of services. The question is the rationale underlying Wisconsin's law. When the policy the law promotes is not efficient use of state funds but the intent *to effect compliance with the NLRA*, the regulation is preempted by the NLRA's establishment of a comprehensive regulatory scheme meant to preclude state action.

*Gould* v. *Wisconsin Dep't of Industry, Labor and Human Relations*, 750 F.2d 608, 614 (7th Cir. 1984) (emphasis added). The South African divestment laws do not depend for their operation on reference to a federal or state regulatory scheme. Moreover, unlike a regulatory scheme, the statutes do not disqualify companies from eligibility for state contracts on the basis of past actions, but rather make the continuing eligibility of the companies subject to certain conditions with which they can comply. Thus, these statutes do not operate like the statute at issue in *Gould*, but rather like the statute at issue in *White* v. *Massachusetts Council of Constr. Employers*, *supra*, in which the City of Boston refused to do business with contractors who did not satisfy certain conditions. Because *Gould* reaffirmed the continuing validity of *White*, *see* 475 U.S. at 289, we do not believe that *Gould* may be fairly interpreted to deny that such conditional refusals to deal enjoy protection from Commerce Clause scrutiny.

Second, *Gould* carefully distinguished the sound foundations of the market participation doctrine in Commerce Clause analysis from the inappropriateness of its extension in the area of preemption analysis under the NLRA. The Court

58

reaffirmed that the Commerce Clause is not intended to "limit the ability of the States themselves to operate freely in the free market," *id.* (quoting *Reeves*, 447 U.S. at 437), and emphasized that the NLRA, in contrast, was intended "in large part to entrust the administration of the labor policy for the Nation to a centralized administrative agency." *Id.* at 289–90 (citations omitted). What is deemed to be regulation in analyzing the preemptive effect of the NLRA therefore is not a guide to what will be considered regulation under Commerce Clause analysis. Finally, it is hardly conceivable that the Court wished to shed light on the scope of the market participation doctrine in the Commerce Clause by means of a single sentence in a preemption case. As we have seen from the discussion in *South-Central Timber*, the scope of the doctrine is highly controversial and at least two of the Justices have taken a position that is flatly inconsistent with treating a debarment statute as "regulation" under the Commerce Clause. *See South-Central Timber*, 467 U.S. at 101–02 (Rehnquist, J., dissenting). We therefore do not believe that *Gould* sheds appreciable light on the scope of the market participation doctrine.[16]

## II. Interference with the Federal Government's Foreign Affairs Power

No provision of the Constitution furnishes the federal government with a general power to conduct foreign affairs. The President, of course, is Commander in Chief of the armed forces of the United States and is also authorized to enter into treaties and to appoint and receive ambassadors. U.S. Const. art. II, § 2. Congress is given authority to regulate foreign commerce, to define offenses against the law of nations and to declare war. *Id.*, art. I, § 8.[17] The state divestment statutes do not interfere with any of these enumerated foreign affairs powers of the President or Congress.

Nor does the Constitution contain a general prohibition against state actions that interfere with the federal government's conduct of foreign affairs. The Constitution imposes the following specific prohibitions on the states in the area of foreign affairs:

> No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal.
>
>         \*        \*        \*
>
> No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be

---

[16] In any event, even on its broadest reading, the sentence in *Gould* does not suggest that a refusal to *invest* in a certain class of companies is tantamount to regulation. A refusal to contract with a company has the effect of denying the company a discrete amount of sales that it would otherwise have enjoyed. Such a refusal therefore has the potential to change the company's behavior so that it may receive the city contract. The refusal to invest in a company, particularly a company with a nationwide market for its securities, has considerably less effect, because market forces will lead others to purchase the securities at the same or marginally lower prices. Because a refusal to invest has such limited potential impact, it cannot seriously be called regulation even in a figurative sense of that term.

[17] The Foreign Commerce Clause is discussed above. *See supra* Part I.

absolutely necessary for executing its inspection Laws: and the net Produce of all Duties and Imposts, laid by any State on Imports or Exports, shall be for the Use of the Treasury of the United States; and all such Laws shall be subject to the Revision and Controul of the Congress.

No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded or in such imminent Danger as will not admit of delay.

U.S. Const. art. I, § 10, cls. 1–3. None of these prohibitions puts any explicit limit on the use of state regulatory or proprietary power that affects foreign governments and consequently the conduct of foreign affairs.

Nevertheless, the Supreme Court has recognized a general principle of federal governmental power to conduct foreign affairs beyond the powers enumerated in the Constitution. This general power has been derived from the proposition that the power to regulate international affairs never resided in the states and therefore was not transmitted to the federal government by the Constitution. Instead, the federal government inherited this general power as a successor to Great Britain. *United States* v. *Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936).[18]

---

[18] The Court explained its theory as follows:

It will contribute to the elucidation of the question if we first consider the difference between the powers of the federal government in respect of foreign or external affairs and those in respect of domestic or internal affairs. That there are differences between them, and that these differences are fundamental, may not be doubted.

The two classes of powers are different, both in respect of their origin and their nature. The broad statement that the federal government can exercise no powers except those specifically enumerated in the Constitution, and such implied powers as are necessary and proper to carry into effect the enumerated powers, is categorically true only in respect of our internal affairs. In that field, the primary purpose of the Constitution was to carve from the general mass of legislative powers *then possessed by the states* such portions as it was thought desirable to vest in the federal government, leaving those not included in the enumeration still in the states. *Carter* v. *Carter Coal Co.*, 298 U.S. 238, 294. That this doctrine applies only to powers which the states had, is self evident. And since the states severally never possessed international powers, such powers could not have been carved from the mass of state powers but obviously were transmitted to the United States from some other source. During the colonial period, those powers were possessed exclusively by and were entirely under the control of the Crown. By the Declaration of Independence, "the Representatives of the United States of America" declared the United [not the several] Colonies to be free and independent states, and as such to have "full Power to levy War, conclude Peace, contract Alliances, establish Commerce and to do all other Acts and Things which Independent States may of right do."

*Curtiss-Wright Corp.*, 299 U.S. at 315–16 (Sutherland, J.) (emphasis in original).

Justice Sutherland's argument has been justly criticized as a misreading of the historical evidence. The framers seem to have believed that federal power in foreign affairs rested on explicit and implicit constitutional grants of authority. *See generally,* C. Lofren, *United States v. Curtiss-Wright Export Corporation: An Historical Reassessment,* 83 Yale L. Rev. 1 (1973).

60

## A. The Effect of Zschernig v. Miller

The Court has only once employed this general power to strike down an exercise of state police power that affected foreign affairs. In *Zschernig* v. *Miller*, 389 U.S. 429 (1968), the Court invalidated an Oregon statute as an unconstitutional intrusion into the federal field of foreign affairs, even though, as the federal government itself admitted, the statute did not conflict with any federal treaty or statute. The state statute at issue provided that a nonresident alien could not inherit property from an Oregon decedent unless three conditions were satisfied: (1) the alien's government must accord Americans the right to inherit on equal terms with its citizens; (2) the alien's government must give Americans the right to receive payment in the United States of funds from foreign estates; and (3) the nonresident alien must be able to receive "the benefit, use or control" of the proceeds of the Oregon estate "without confiscation" by his government. The Court concluded that this type of probate law *as enforced in the Oregon courts* had "a direct impact on foreign relations and may well adversely affect the power of the central government to deal with those problems." *Id.* at 441. Justice Douglas stressed that the federal government's foreign policy prerogatives were offended because the state courts made persistent inquiries into the actual administration of foreign laws and in doing so questioned the credibility of foreign officials and made ad hoc decisions based on "foreign policy attitudes" toward particular governments. *See* 389 U.S. at 437 ("As one reads the Oregon decisions, it seems that foreign policy attitudes, the freezing or thawing of the 'cold war,' and the like are the real desiderata").

*Zschernig* stands for the proposition that the Court will scrutinize state statutes to determine whether such statutes have a direct impact on foreign relations; the case may not fairly be interpreted to mean that the court will strike down any state exercise of authority that has some indirect impact on foreign affairs or that is intended to affect the behavior of foreign governments. *Zschernig* did not overrule *Clark* v. *Allen*, 331 U.S. 503 (1947), in which the Court, in an opinion also written by Justice Douglas, upheld the facial validity of a California statute similar to the first two sections of the Oregon law.[19] Although the California statute was clearly designed to influence foreign countries to change their laws to allow Americans to inherit, the Court dismissed the challenge to the statute as "farfetched." *Id.* at 517.[20] Emphasizing that "rights of succession" were peculiarly a matter of local law, the Court agreed that "what California has done will have some incidental or indirect effect on foreign countries," but concluded "that is true of many state laws which none would claim cross the forbidden line." *Id.*

---

[19] The California statute requires (1) that the alien's government must accord Americans the right to inherit on equal terms with its citizens; and (2) that the alien's government must give Americans the right to receive payment in the United States of funds from foreign estates.

[20] The Court analogized the case to *Blythe* v *Hinckley*, 180 U.S. 333 (1901), which rejected the claim that a statute granting aliens an unqualified right to inherit property constituted, in the absence of a treaty, a forbidden intrusion into foreign affairs.

Read together, *Zschernig* and *Clark* suggest that even in scrutinizing state statutes that have an impact on foreign affairs, the Court will balance the degree to which the statute intrudes on foreign affairs against the degree to which the exercise of the state power falls within traditional state powers. In both *Clark* and *Zschernig*, states were performing a traditional state function in establishing a rule of inheritance. What distinguished the cases was that the California statute had only an indirect influence on foreign affairs because the state legislature's judgment could be implemented simply through the "routine reading of foreign law." *Zschernig*, 389 U.S. at 433. The Oregon statute, on the other hand, by forcing state courts to assess the actual operation of foreign laws allowed state courts to evaluate the credibility of foreign representatives and engage in persistent "judicial criticism" of foreign states — actions that are outside the state court's ordinary competence and which have a direct impact on foreign relations.

Application of such a balancing test to divestment statutes yields the conclusion that they do not impermissibly encroach into the realm of foreign affairs. First, like the statute at issue in *Clark*, and unlike the statute at issue in *Zschernig*, the implementation of the South African divestment statute would require no investigation by state officials into the operation of South African law and require no assessment of the credibility of South African officials. Second, the statute would fall directly on American companies and only indirectly on South Africa. Moreover, in deciding how it will invest funds under its control, a state acts as "guardian and trustee of its people," *see Reeves*, 447 U.S. at 438, and therefore the state should be given greater latitude to express its citizens' views than in regulatory measures.

Finally, in evaluating the impact of state investment decisions on foreign policy, it should be noted that a state is necessarily involved in the investment of state funds. States do not have to put reciprocity clauses in their probate statutes, but a state must decide to invest state funds on some basis. A state for instance, may decide not to invest in a company doing business in South Africa because it believes that there is a large risk of revolution and, thus, of expropriation in that country. The decision would have an impact on South Africa and on national policy toward that country identical to a decision to divest on the basis of moral opposition to South Africa's system of apartheid.[21] But surely no one would suggest that states are constitutionally forbidden from making such investment decisions. We therefore question the proposition that state divestment statutes should be subject to challenge simply because they have some impact on South Africa and our foreign policy toward that country. If state investment decisions are subject to invalidation for intrusion into foreign policy, we perceive no limiting principle to prevent constant judicial scrutiny of those decisions for consistency with some perceived foreign policy.

---

[21] It might be argued that a decision to divest based on moral grounds had a greater stigmatizing effect than such a decision based on purely economic grounds. We believe, however, that a refusal to invest on economic grounds represents a vote of no-confidence in South Africa's future and therefore has a stigmatizing effect. In any event, no case suggests that the moral views of the community may not be a basis for legislation relating to the state's investment practices or its business dealings. *See supra* note 6.

## B. Zschernig v. Miller and the Market Participant Doctrine

Although we believe that South African divestment statutes should and would survive application of the principle embodied in *Zschernig* v. *Miller*, we do not think the principle should be extended to state proprietorial action.

We believe that the reasoning underlying the market participant doctrine in the area of the dormant Commerce Clause has general applicability.[22] Any constitutional principle or privilege relied on to preempt state exercise of proprietary power must be analyzed to determine whether the principle or privilege was specifically aimed at constraining proprietary power.[23] In the absence of any such intent, it is inappropriate to strike down a state's exercise of proprietary power unless the federal government affirmatively invokes its authority to regulate the state's market dealings to the extent and in the same manner that it may regulate any other participant.[24]

The historical rationale for the general federal power over foreign affairs does not imply the displacement of state proprietary power. Although, according to *Curtiss-Wright*, the states never had any power to conduct foreign relations and consequently the federal government received such powers as

[22] *Gould*, 475 U.S. 282, is not to the contrary. There the Court rejected the extension of the market participant doctrine *to* preemption analysis under the NLRA, reasoning that the NLRA's comprehensive regulatory scheme reflects an intent to prevent state action that supplements the penalties prescribed by the Act. The Court specifically contrasted the NLRA with the Commerce Clause, which does not interfere in and of itself with the power of the states to contract freely in the open market. Therefore the market participation doctrine may be extended to legal provisions or principles that are not intended to constrain state proprietary as opposed to regulatory power.

[23] We do not believe, of course, that the regulatory/proprietary distinction should be applied to diminish the constitutional protections that apply directly to the states. A state could not, for instance, grant contracts on the basis of racial preference simply because it was exercising proprietary rather than regulatory powers. Similarly, because most of the protections of the Bill of Rights have been applied directly to states by the Supreme Court, state action of whatever kind — proprietary or regulatory — is subordinate to those rights. In contrast, the legal provisions at issue here — the Commerce Clause, the general federal power over foreign affairs, and Executive Order No. 12532 — impose no explicit prohibition on the states' exercise of power. In attempting to determine the extent to which the negative implications of these provisions should forestall the exercise of state power, the proprietary/regulatory distinction is useful because it bears both on the strength of the state interest in exercising power and the federal interest in constraining that power. *See* Wells & Hellerstein, *The Governmental-Proprietary Distinction in Constitutional Law*, 66 Va. L. Rev. 1073, 1134–35 (1980)

[24] *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985), is not inconsistent with the application of the proprietary/regulatory distinction to limit the use of negative implications of constitutional principles to prohibit state action. In *Garcia*, the Supreme Court held that notions of state sovereignty did not prevent the federal government from imposing minimum wage and overtime provisions on employees of state mass transit systems. The *Garcia* Court explicitly overruled *National League of Cities* v. *Usery*, 426 U.S. 833 (1976), which held that "traditional governmental functions of the state" were immune from federal regulation. In arguing that state divestment statutes are not preempted by the federal foreign affairs power, the Commerce Clause, or any federal statute, we do not argue that a state's actions as a market participant cannot be regulated or prohibited if Congress chooses to do so.

Indeed, the underlying rationale of *Garcia* supports the argument that the representative branches of the federal government rather than the courts should decide whether the state may divest from or refuse to contract with companies which do business in South Africa. In *Garcia*, the Court reasoned that there was no need for the judiciary to protect state sovereignty because "the [national] political process ensures that laws that unduly burden the states will not be promulgated." 469 U.S. at 556. The protection of national political process is rendered illusory, however, if the state proprietorial actions are struck down by the negative implications of unexercised federal powers rather than affirmative action of the federal government.

successor to Great Britain, the states have always possessed proprietary powers. As the Supreme Court has emphasized, the power to impose conditions on state contractors derives from the power of any corporate entity, private or public, to deal with whomever it chooses. *See, e.g., Perkins* v. *Lukens Steel Co.,* 310 U.S. 113, 127 (1940) ("Like private individuals and businesses, the government enjoys the unrestricted power to produce its own supplies and to determine with whom it will deal and to fix the terms and conditions upon which it will make the needed purchases"). Because states, like any corporate entity, possessed proprietary powers at the time of the Constitution, these powers should not be displaced unless they are prohibited by a specific limitation imposed by the Constitution or federal legislation passed pursuant to a constitutional grant of power to the federal government.[25]

Moreover, the functional rationale for displacing state regulatory power does not apply fully to a state's exercise of proprietary power. A state regulation prohibiting certain corporations (*e.g.,* those organized under the state's laws, or those doing business within the state's borders) from undertaking business in a foreign country would directly affect that foreign country and might have a large potential influence on that country's attitudes toward the United States. In contrast, the state's power to refuse to deal locally with companies doing business in a foreign country is by its nature limited, because it leaves the ultimate decisions whether to continue to do business in the foreign country with the corporations themselves.

## IV. Preemption

The final ground on which the divestment statutes may be attacked is that of preemption. It has been suggested that both the Export Administration Act and Executive Order No. 12532 demonstrate an intent by the federal government to preempt any exercise of state power that affects companies doing business with South Africa. Neither Executive Order No. 12532 nor the Act, however, represents a comprehensive regulation of trade or investment with South Africa, nor do they display any intent to displace the traditional power of the state to make investment and contracting decisions.

The touchstone of a preemption claim is the intent of Congress. *See Malone* v. *White Motor Corp.,* 435 U.S. 497, 504 (1978). When the state law at issue in a preemption case is enacted "in a field which the states have traditionally . . . occupied we start with the assumption that historic . . . powers of the states [are] not to be [ousted] by the Federal Act unless that were the clear and manifest purpose of Congress." *Rice* v. *Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947). The exercise of proprietary powers to contract with and invest in companies of their choice is, to say the least, a field traditionally occupied by

---

[25] As we have discussed above, *see supra* notes 12, 13, when the Framers discussed the danger of state intervention in foreign affairs, the danger to which they specifically referred invariably arose from an exercise of state regulatory power, usually in the form of tariffs. Our research has revealed no evidence that Framers were concerned with the effects of decisions by states as market participants.

the states. Therefore, it should be inferred that Congress or the President intended to preempt state proprietary powers only when such an intent is explicit or "where the scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress [or the President] left no room to supplement it." *Id.*

Here, however, neither Executive Order No. 12532 nor the Export Administration Act explicitly prevents the state from investing or contracting with companies it chooses, even if those choices are based on its views toward South Africa. Nor does either Executive Order No. 12532 or the Export Administration Act demonstrate an intent to occupy the field of investment or contractual decisions so as to raise any inference that the state divestment statutes are preempted.[26]

The Export Administration Act permits the President to control exports for reasons of national security, foreign policy and short supply. *See* 50 U.S.C. app. §§ 2404–2406. The Act outlines the factors governing invocation of the Act and establishes various procedures for reporting to Congress. The legislation is thus principally designed to authorize the President to curtail trade in a national emergency. Although the Export Administration Act does state that it is the policy of the United States to encourage free trade, *see* 50 U.S.C. app. § 2401, it does not purport generally to regulate the proprietary decisions of entities — public or private — with respect to companies doing business in any particular nation.[27] Therefore, whatever the preemptive effect of the statute on state *regulation* of companies doing business in South Africa, the Export Administration Act cannot be deemed to preempt state divestment statutes.

The recent case of *Wisconsin Dep't of Industry* v. *Gould, Inc.*, *supra*, does not strengthen the case for preemption by the Export Administration Act. The NLRA represents a "'complex and interrelated federal scheme of law, remedy

---

[26] *Hines* v. *Davidowitz*, 312 U.S. 20 (1941) is therefore inapposite. In that case, the Supreme Court struck down a Pennsylvania law that required aliens living in the state to register on the grounds that Congress had already passes a "complete system for alien registration." *Id.* at 51. Here Congress has passed no legislation comprehensively regulating investment or contractual decisions.

[27] The Export Administration Act forbids corporations from joining a boycott against one foreign nation initiated by another foreign nation. Section 2407 of the Export Administration Act authorizes the President to issue regulations prohibiting entities from

> taking or knowingly agreeing to take . . . [certain] actions with intent to comply with, further, or
> support any boycott fostered or imposed by a foreign country against a country that is friendly to
> the United States and which is not itself the object of any form of boycott pursuant to United
> States law and regulations.

These boycott provisions are inapplicable here, however, because the states in enacting the divestment statutes are not joining a boycott initiated by another country, but are acting either to safeguard their investments or to reflect the moral views of their citizens toward South Africa's racial policies.

Indeed, the boycott provisions support the proposition that other provisions in general do not preempt state law. Section 2407(c) specifically declares:

> [Section] 2407 and the regulations issued pursuant to it, shall preempt any law, rule, or regula-
> tions of any of the several States or the District of Columbia, . . . or of any governmental
> subdivision thereof, which law, rule, or regulation pertains to participation in, compliance with,
> implementation of, or the furnishing of information regarding, restrictive trade practices, or
> boycotts fostered or imposed by foreign countries against other countries.

The inference through the principle of *inclusio unius est exclusio alterius* is therefore that the other provisions of the Act are not intended to preempt state law.

and administration.'" 475 U.S. at 286; *see San Diego Building Trade Council* v. *Garmon*, 359 U.S. 236 (1969). As a result the NLRA occupies the field of industrial relations and the preemptive effect of labor law has always been given extraordinarily broad scope. As the *Gould* Court itself noted, "it is by now a commonplace that in passing the NLRA, Congress largely displaced state regulation of industrial relations." 475 U.S. at 286. In contrast, the Export Administration Act does not represent a complex scheme of regulation: its essential function is simply to permit the President under certain conditions to regulate trade with certain countries.

Moreover, the essential premise of *Gould* was that the Wisconsin statute acted as a supplemental remedy to the NLRA because it specifically conditioned the suspension of state business dealings on a violation of the NLRA. Because the NLRA already provided a comprehensive and integrated set of remedies, Wisconsin's debarment statute, viewed as an additional sanction, was preempted. *See Garner* v. *Teamsters*, 346 U.S. 485, 498–99 (1953) (stating that the "conflict [between state and federal law] is imminent" whenever "two remedies are brought to bear on the activity"). State divestment statutes, however, do not provide remedies for violations of a federal statute which itself provides a comprehensive remedial scheme.

In our view, Executive Order No. 12532 is an even weaker reed on which to rest a preemption claim. Executive Order No. 12532 declared a national emergency pursuant to the International Emergency Economic Powers Act of 1977 (50 U.S.C. §§ 1701 *et seq.*) (IEEPA). Using authority granted under IEEPA, the President imposed certain economic sanctions on South Africa. He also required United States companies operating in South Africa to conduct their business there according to certain principles. Nothing in Executive Order No. 12532, however, purported to require entities to continue to do business with South Africa or with companies doing business in South Africa. Nor does it represent a comprehensive scheme which is designed to regulate contractual or investment decisions relating to South Africa.

Moreover, as the President himself stated, Executive Order No. 12532 "reflected Congressional concerns" underlying proposed legislation designed to forbid certain transactions with South Africa. *See* Message of the President to the Congress of the United States: Transmitting Notification of a Declaration of a National Emergency with Respect to South Africa (Sept. 9, 1985). In the course of the congressional debate on the statutory proposals, many proponents stated that the legislation was not intended to preempt state divestment legislation. *See, e.g.*, 131 Cong. Rec. 18824 (1985) (remarks of Senator Cranston). In the absence of language to the contrary, this background strongly suggests that Executive Order No. 12532 was not intended to preempt state legislation.[28]

---

[28] Given that Executive Order No. 12532 does not on its face regulate state contracts or state investments, courts likely would not take a preemption claim seriously unless the Administration filed a brief stating that the Executive Order was intended to preempt state laws. *Cf. Container Corp.*, 463 U.S. at 195 n.33 (absence of Solicitor General's brief claiming that California tax interfered with execution of United States foreign policy was factor in court's decision not to strike down tax). Therefore, in filing a brief arguing for the

Continued

## Conclusion

For the reasons stated, we believe that state divestment legislation is constitutional. We therefore do not believe that the United States should file suit to invalidate these laws or file any amicus brief on behalf of those seeking to invalidate them.

CHARLES J. COOPER
*Assistant Attorney General*
*Office of Legal Counsel*

---

[28] (. . . continued)
preemptive effect of the Executive Order and, to a lesser extent, in making other arguments in favor of the preemption of state divestment, the Administration would inevitably be making a policy choice — one that would not comport with its general policy of favoring federalism.

67