The Honorable Tim Shallenburger Speaker of the House State Representative, 1st District 2027 Fairview Baxter Springs, Kansas 66713
Dear Speaker Shallenburger:
You request our opinion regarding whether certain statutes that address the deposit of public funds are violative of the commerce clause, the supremacy clause or the equal protection clause of the United States constitution. Specifically, you inquire whether the statutory requirement that public funds be deposited only in state or national banks having a home office in Kansas contravenes any one of the aforementioned constitutional provisions.
K.S.A. 9-1401 provides, in relevant part, as follows:
 "(a) The governing body of any municipal corporation or quasi-municipal corporation shall designate . . . the state and national banks . . . with home offices located in the state of Kansas which shall serve as depositories of its funds. . . . The state and national banks . . . which have offices in the county or counties in which all or part of such municipal corporation or quasi-municipal corporation is located shall be designated as such official depositories if the municipal or quasi-municipal corporation can obtain satisfactory security therefore, and such official depositories have a home office located in the state of Kansas.
. . . .
 "(c) As used in this section . . . `municipal corporation or quasi-municipal corporation' includes each investing governmental unit under K.S.A. 12-1675. . . ." (Emphasis added).
K.S.A. 1994 Supp. 12-1675 provides, in relevant part, as follows:
 "(a) The governing body of any county, city, township, school district, area vocational-technical school, community college, firemen's relief association, community mental health center, community facility for the mentally retarded or any other governmental entity, unit or subdivision in the state of Kansas having authority to receive, hold and expend public moneys or funds may invest any moneys which are not immediately required for the purposes for which the moneys were collected or received, and the investment of which is not subject to or regulated by any other statute.
"(b) Such moneys shall be invested only:
. . . .
 "(2) In time deposit, open accounts or certificates of deposit with maturities of not more than two years: (A) In commercial banks which have offices located in such investing governmental units; or (B) if the office of no commercial bank is located in such investing governmental unit then in commercial banks which have offices in the county or counties in which all or part of such investing governmental unit is located."
In Attorney General Opinion No. 95-39 we concluded that K.S.A. 1994 Supp. 12-1675 requires that the municipal and quasi-municipal entities listed in the statute may invest their idle funds only in financial institutions with home offices in the state. Article 42 of chapter 75 of the Kansas statutes annotated similarly requires that state moneys be deposited and invested only in state banks incorporated in Kansas or national banks having home offices in this state. K.S.A. 1994 Supp.75-4201(d); 75-4205; 75-4209, as amended by L. 1995, ch. 194, sec. 2.
Your concern is that these statutes may conflict with the Riegle-Neal interstate banking and branching efficiency act (Riegle-Neal) by discriminating against national banks that have branch offices in Kansas but home offices located outside of this state. If there is a conflict, you question whether the Kansas statutes must fall as a result of the supremacy clause. In addition, you are concerned whether these statutes offend both the commerce clause and the equal protection amendment to the United States constitution.
I. SUPREMACY CLAUSE
Article 6 provides that the United States constitution and federal law which is enacted according to the constitution is the supreme law of the land, notwithstanding state laws to the contrary. This constitutional provision has spawned the preemption doctrine which provides that a state law is void if it conflicts with federal law. Louisiana Public Service Comm'n. v. F.C.C., 476 U.S. 355,106 S.Ct. 1890, 90 L.Ed.2d 369 (1986).
 "Consideration of issues arising under the supremacy clause start with the assumption that the historic police powers of the states are not to be superseded by federal law unless that is the clear and manifest purpose of Congress. (Citations omitted). Accordingly, the purpose of Congress is the ultimate touchstone of preemption analysis. Congress' intent may be explicitly stated in the statute's language or implicitly contained in its structure and purpose. In the absence of an express congressional command, state law is preempted if that law actually conflicts with federal law or if federal law so thoroughly occupies the legislative field as to make reasonable the inference that Congress made no room for states to supplement it. Cipollone v. Liggett Group Inc., 505 U.S. ___, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407
(1992).
Our task is to determine whether congress intended to preempt state laws regarding the deposit of public funds when it enacted the Reigle-Neal act. Before we begin this analysis it is helpful to understand some banking law concepts.
Banks are formed by obtaining a charter (a license to do business) either from the federal government or from one of the states. If a bank is federally chartered, it is a national bank subject to regulation by the office of the comptroller of the currency (comptroller). If a bank is state chartered, it is a state bank subject to regulation by the state. State banks also choose whether to become members of the federal reserve system. If they do so, they are known as state member banks and the federal reserve becomes their primary federal regulator; if they do not, they are known as state nonmember banks and the federal deposit insurance corporation becomes their primary federal regulator. 112 Banking Law Journal 100, 102 (February, 1995).
Prior to 1927, national banks were not allowed to establish branches and, consequently, suffered a competitive disadvantage with state chartered banks that were allowed to establish branch offices to the extent that state law permitted. In order to place national banks on an equal playing field with state banks, congress passed the McFadden act (12 U.S.C. § 36) which permits national banks to branch in the cities in which they are located to the same extent that such branching is permitted for state banks under state law. In 1933, congress amended the McFadden act to permit a national bank to branch within the state in which it is located to the same extent as a bank chartered by that state. In Clarke v. Securities Industry Assn., 479 U.S. 388,107 S.Ct. 750, 93 L.Ed.2d 757 (1987), the Supreme Court concluded that a national bank could only branch in its home state and only to the extent permitted by state law. K.S.A. 1994 Supp. 9-1111, as amended by L. 1995, ch. 79, requires banks to have home offices in this state before they can establish branches. To bypass this requirement of conforming to state law, some national banks began to take advantage of a 1994 comptroller decision which interpreted federal law as allowing a national bank to relocate its main office to a location not more than 30 miles from its previous location and retain the ability to operate its existing branches in the former state where the main office had been located regardless of contrary state law. 12 U.S.C. § 30; Decision of theOffice of the Comptroller of the Currency on the Applications ofFirst Fidelity Bank, National Association, Pennsylvania,Philadelphia, Pennsylvania, and First Fidelity Bank, NationalAssociation, New Jersey, Newark, New Jersey (January 10, 1994). The result is that a national bank with a home office in Kansas City, Kansas may relocate its home office to Kansas City, Missouri and retain the ability to operate its branches in Kansas even though state law prohibits a bank from establishing branches when the bank's home office is located in another state. Attorney General Opinion No. 94-128.
After June 1, 1997 (or earlier, if a state "opts-in") the Reigle-Neal act will make it easier for banks to branch across state lines by allowing mergers between insured banks with different home states. 12 U.S.C. § 1831u. A bank resulting from such a merger may maintain and operate branches in any state where any bank involved in the transaction could have previously operated branches. 12 U.S.C. § 36(d). A state may "opt-in" and allow interstate mergers (and its subsequent branching possibilities) prior to June 1, 1997 by enacting a law that so provides. States may also "opt-out" of interstate branching by enacting a law before June 1, 1997 that expressly prohibits merger transactions involving out-of-state banks.12 U.S.C. § 1831u(a)(2), (3).
Until May 31, 1997 national banks will still be able to relocate their main office and operate branches in the state where the main office was previously located but, after that date, banks will have to conform to 12 U.S.C. § 36(e)(2) which contains more onerous requirements. 12 U.S.C. § 36(f) addresses the issue of to what extent state law applies to the branches that are created as a result of mergers and main office relocations.
Title I, section 102(b) of the Riegle-Neal act [12 U.S.C. § 36(f)] states, in relevant part, as follows:
"(f) Law applicable to interstate branching operations
"(A) In general
 "The laws of the host State regarding community reinvestment, consumer protection, fair lending, and establishment of intrastate branches shall apply to any branch in the host State of an out-of-State national bank to the same extent as such State laws apply to a branch of a bank chartered by that State, except —
 "(i) when Federal law preempts the application of such State laws to a national bank; or
 "(ii) when the Comptroller of the Currency determines that the application of such state laws would have a discriminatory effect on the branch in comparison with the effect the application of such State laws would have with respect to branches of a bank chartered by the host State.
"(B) Enforcement of applicable State laws
 "The provisions of any State law to which a branch of a national bank is subject under this paragraph shall be enforced, with respect to such branch, by the Comptroller of the Currency.
"(2) Treatment of branch as bank
 "All laws of a host State, other than the laws regarding community reinvestment, consumer protection, fair lending, establishment of intrastate branches, and the application or administration of any tax or method of taxation, shall apply to a branch (in such State) of an out-of-State national bank to the same extent as such laws would apply if the branch were a national bank the main office of which is in such State.
"(3) Rule of construction
 "No provision of this subsection may be construed as affecting the legal standards for preemption of the application of State law to national banks." (Emphasis added).
Kansas public fund depository laws are not laws regarding community reinvestment, consumer protection, fair lending and the establishment of intrastate branches. Our focus is therefore on the emphasized portion of 12 U.S.C. § 36(f)(2) dealing with the application of state law to the branches which result from mergers and main office relocations.
You inquire whether 12 U.S.C. § 36(f)(2) preempts the Kansas laws that preclude the state and its municipalities from considering as public depositories branches of national banks that do not have a home office in this state.
Applying preemption principles, we find no explicit preemption language in the Reigle-Neal act that supersedes state laws regulating the deposit of public funds so we examine whether the act occupies a legislative field to such an extent that it is reasonable to infer that congress left no room for the states to supplement it.
In searching for evidence of an explicit intent we are mindful that preemption is not favored in the absence of persuasive reasons either that the regulated subject matter permits no other conclusion or that congress has so ordained. Chicago andNorthwestern Transportation Company v. Kalo Brick Tile Company,450 U.S. 311, 67 L.Ed.2d 258, 264-65, 101 S.Ct. 1124 (1981). This disfavor is even stronger in areas which are traditionally occupied by the states. Douglas v. Seacoast Products, Inc.,431 U.S. 265, 52 L.Ed.2d 304, 311-12, 97 S.Ct. 1740 (1977). It is our opinion that one of the attributes of sovereignty is the ability of the state to deposit its funds in financial institutions of its choice.
 "The power of a state to govern men and things will not be lightly stricken down by implication and an unexpressed purpose of Congress to set aside statutes of states regulating their internal affairs is not lightly to be inferred and ought not to be implied where the legislative command, read in light of the history, remains ambiguous. Penn Dairies v. Milk Control Commission, 318 U.S. 261, 63 S.Ct. 617, 87 L.Ed. 748, 756 (1943).
 "So, the intention of Congress to exclude states from exercising their reserved powers must be clearly manifested and courts will not lightly infer that Congress by mere passage of a federal act has impaired the traditional sovereignty of the state." Rice v. Santa Fe Elevator Corporation, 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947).
The Reigle-Neal act contains many references to state law and we find no intent that congress "left no room for the states to supplement" this federal law. Specifically, states are allowed to opt-out of interstate banking by enacting a law that prohibits such activity, or they may opt-in prior to June 1, 1997 if they enact a law that so provides. A state law allowing early merger activity may impose certain conditions on interstate branches resulting from such mergers provided the conditions do not discriminate, are not preempted and do not apply after May 31, 1997. 12 U.S.C. § 1831u. Furthermore, state law may require a target bank to be in existence for up to 5 years before it may be acquired. 12 U.S.C. § 1831u(a)(5). Banks seeking to engage in merger transactions must comply with state filing requirements as long as the filing requirements do not discriminate against out of state institutions.12 U.S.C. § 1831u(b). After a bank merger is complete, the state may impose further notification or reporting requirements on the bank provided they do not discriminate against out of state institutions and are not preempted by federal law.12 U.S.C. § 1831u(c)(4). State taxation authority and state antitrust laws are unaffected by the Reigle-Neal act.12 U.S.C. § 1831u(c)(1), (2).
In short, the case for federal preemption is weakened where congress has indicated its awareness of state law in a field of federal interest and nonetheless decides to stand by both concepts and tolerate whatever tension there is between them. BonitoBoats, Inc. v. Thunder Craft Boats, 489 U.S. 141, 109 S.Ct. 971,103 L.Ed.2d 118, 144 (1984).
There is no doubt that federal interest is great in the area of banking especially in light of the pervasive federal regulation of both national and state banks. However, the Reigle-Neal act acknowledges the application of state law and goes so far as to authorize the comptroller to enforce state statutes regarding community reinvestment, consumer protection, fair lending and the establishment of intrastate branches. 12 U.S.C. § 36(f)(1)(B). We do not believe that congress intended to preempt the ability of a state to decide where it places its funds and the funds of its municipalities. If this were congress' intent, it is our opinion that the Reigle-Neal act would go beyond the scope of congress' enumerated powers and would be unconstitutional as applied (see section II for a discussion of this issue). In that event, the supremacy clause would be unavailing because federal law cannot be supreme unless it is constitutional. Pacific Gas Electric v.Energy Resources Comm'n, 461 U.S. 190, 75 L.Ed.2d 752, 765,103 S.Ct. 1713 (1983).
Furthermore, preemption is not implied absent an actual conflict between state and federal law and conflicts are not sought where none clearly exist. English v General Electric Company,496 U.S. 72, 110 S.Ct. 2270, 110 L.Ed.2d 65, 81 (1990). A conflict exists when it is impossible to comply with both federal and state law.Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 79 L.Ed.2d 443,104 S.Ct. 615, 621 (1984). It is our opinion that the state public depository laws do not conflict with the ability of a national bank to merge and establish branches or relocate its main office into another state. From a business standpoint, it may discourage such activity but it does not rise to the level of a conflict.
Finally, preemption is implied if state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." C.S.X. Transportation v. Easterwood, 507 U.S. ___, 123 L.Ed.2d 387, 396, 113 S.Ct. 1732 (1993).
 "Where a state statute conflicts with or frustrates federal law, the former must give way. In the interest of avoiding unintended encroachments on the authority of the state, however, a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find preemption." C.S.X. Transportation 123 L.Ed.2d at 396.
While the state laws regarding the deposit of public funds may be an obstacle for national banks considering relocation or mergers, it is our opinion that this type of obstacle was not considered by congress when it enacted subsection (f)(2) of12 U.S.C. § 36 because of the potential for exceeding the scope of congress' enumerated powers and violating thetenth amendment.
II. THE TENTH AMENDMENT
The United States constitution establishes a system of dual sovereignty between the states and the federal government.Gregory v. Ashcroft, 501 U.S. 452, 115 L.Ed.2d 410,111 S.Ct. 2395 (1991). Under our federal system, the states possess sovereignty to manage their own affairs except as otherwise provided by the federal constitution. Madden v. Kentucky,309 U.S. 83, 84 L.Ed. 590, 60 S.Ct. 406 (1940).
The authority to make fundamental decisions and set policy is a quintessential attribute of sovereignty. Federal EnergyRegulatory Commission v. Mississippi, 456 U.S. 742,72 L.Ed.2d 532, 102 S.Ct. 2126 (1982). As indicated in section I, it is our opinion that where the state chooses to deposit its public funds and the funds of its municipalities is a decision of the most fundamental sort for a sovereign state which the latter is entitled to make as long as the policy does not violate one of the powers delegated to the federal government in article 1, sec. 8 of the United States constitution.
Article 1, section 8 of the United States constitution is a list of the powers granted to congress. As long as congress is acting within these enumerated powers it may impose its will on the states even in areas traditionally regulated by the states. However, it is a power that congress may not exercise lightly.Gregory, 115 L.Ed.2d at 423.
The Riegle-Neal interstate banking and branching efficiency act (Riegle-Neal act), enacted on September 29, 1994, regulates interstate banking and branching by allowing bank holding companies (after September 29, 1995) to acquire banks in any state even if state law prohibits the transaction. 12 U.S.C. § 1842(d). Furthermore, commencing on June 1, 1997, federal banking agencies may approve mergers between insured banks (i.e. state chartered banks and national banks) with different home states.12 U.S.C. § 1831u. A bank resulting from such a merger will be able to maintain and operate branches in any state where any bank involved in the transaction could have operated branches.12 U.S.C. § 36(d).
As indicated in our discussion of the supremacy clause, it is our opinion that the Riegle-Neal act may exceed the scope of congress' enumerated powers if it is interpreted to require a state to consider placing its funds and the funds of its municipalities in a branch office of a national bank with a home office outside of the state. If the act exceeds congressional authority the act will be invalid as applied. New York v. United States,505 U.S. 144, 120 L.Ed.2d 120, 112 S.Ct. 2408 (1992).
 "If a power is delegated to Congress in the constitution, the 10th amendment expressly disclaims any reservation of that power to the states; if a power is an attribute of state sovereignty reserved by the 10th amendment it is necessarily a power the constitution has not conferred on Congress. (Citations omitted.)
 "Congress exercises its conferred powers subject to the limitations contained in the constitution. Thus, for example, under the commerce clause Congress may regulate publishers engaged in interstate commerce but Congress is constrained in the exercise of that power by the first amendment. The 10th amendment likewise restrains the power of Congress, but this limit is not derived from the text of the 10th amendment itself, which, as we have discussed is essentially a tautology. Instead, the 10th amendment confirms that the power of the federal government is subject to limits that may, in a given instance, reserve power to the state. The 10th amendment thus directs us to determine, as in this case, whether an incident of state sovereignty is protected by a limitation on an article 1 power." New York v. United States, 505 U.S. 144, 120 L.Ed.2d 120, 137-138, 112 S.Ct. 2408 (1992).
Our question is whether 12 U.S.C. § 36(f)(2) may be interpreted to require the state of Kansas to authorize placement of its funds and the funds of its municipalities in branches of national banks that do not have main offices in this state.
The legislative history of this subsection gives some indication that laws of the host state may not discriminate against branches of out-of-state national banks.
 "New subsection 5155(f), [12 U.S.C. § 36(f)] provides that interstate branches shall be subject to the laws of the host state with respect to intrastate branching, consumer protection, fair lending and community reinvestment as if the branch were a branch of a bank chartered by that state, regardless of how or when the interstate branch was established or acquired, except to the extent such state law is preempted by federal law. All other laws of the host state which do not discriminate against branches of out of state banks shall apply to a branch in the host state as though it were a national bank located in the state." House Report 103-448 at 5 U.S. Code Congressional and Administrative News, p. 2047 (1994).
 "Banks that have moved their main offices pursuant to 12 U.S.C. § 30
should not be treated differently than other banks with their main offices in that state. Specifically, . . . such banks shall be able to make acquisitions and establish branches in the state to which their main office is relocated to the same extent as any other bank with its main office in that state." House Conference Report 103-651 at 5 U.S. Code Congressional and Administrative News, p. 2078 (1994). (Emphasis added).
While it is apparent that the effect of the public fund depository laws is to discriminate against national bank branches with home offices out of state, the issue is whether12 U.S.C. § 36(f)(2), if interpreted to prohibit this kind of discrimination by requiring the state to consider these banks as contenders for the state's banking business, oversteps the boundary between federal and state authority.
In New York v. United States, supra, the state of New York sought a declaratory judgment that a provision of the low-level radioactive waste policy amendments act violated the 10th amendment. The provision in issue provided that if a state were unable to provide for the disposal of low-level radioactive waste generated within the state by a certain date, the state would have to take title to the waste and be liable for any damages incurred by the waste generator. The court concluded that the take-title provision was unconstitutional because it would "commandeer" state government into the service of the federal government.
 "In providing for a stronger central government, therefore, the framers explicitly chose a constitution that confers upon Congress the power to regulate individuals, not states. As we have seen, the court has consistently respected this choice. We have always understood that even where Congress has the authority under the constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the states to require or prohibit those acts. (Citations omitted). The allocation of power contained in the commerce clause, for example, authorizes Congress to regulate interstate commerce directly; it does not authorize Congress to regulate state governments' regulation of interstate commerce.
 "Whether one views the take-title provision as lying outside Congress' enumerated powers, or as infringing upon the core of state sovereignty reserved by the 10th amendment, the provision is inconsistent with the federal structure of our government established by the constitution." New York, 120 L.Ed.2d at 144, 151.
Following Justice O'Conner's lead in the New York case, other courts are viewing federal legislation that imposes requirements on state government in light of the 10th amendment. McGee v.United States, 863 F. Supp. 321 (S.D.Miss. 1994) (portion of Brady bill, 18 U.S.C. § 922, requiring sheriffs to make an effort to research whether receipt of a gun by a prospective purchaser would violate law offends 10th amendment); Bd. ofNatural Resources v. Brown, 992 F.2d 937 (9th Cir. 1993) (portion of federal law that directs states to ban export of certain timber violates 10th amendment).
Using the same rationale, if 12 U.S.C. § 36(f)(2) is interpreted to require the state of Kansas to consider placing its funds and the funds of its municipalities in depositories that the state does not want to consider, then it is our opinion that12 U.S.C. § 36(f)(2) is unconstitutional as applied because it exceeds the scope of congress' enumerated powers and, therefore, offends the 10th amendment.
We note that the Riegle-Neal act is one year old and our research has detected no appellate cases or comptroller decisions that interpret this particular section in the context of public fund depository laws and the tenth amendment. If the comptroller were to consider this issue and render an opinion we would be amenable to a reconsideration of our conclusion.
III. COMMERCE CLAUSE
The commerce clause grants to congress the power to regulate commerce among the states. U.S. Const., art. I, sec. 8. Although the clause speaks in terms of powers bestowed upon congress, the United States Supreme Court has recognized that it also limits the power of the states to erect barriers against interstate trade.Lewis v. BT Investment Managers, Inc., 447 U.S. 27,64 L.Ed.2d 702, 100 S.Ct. 2009 (1980). In Lewis, the court concluded that a Florida statute which prohibited out-of-state financial institutions from owning or controlling investment advisory services within the state of Florida contravened the commerce clause's limitation on state power.
While it can be argued that the Kansas public fund depository laws prevent national banks with home offices in other states from competing for public fund deposits, the United States Supreme Court has carved out an exception to the commerce clause when states and municipalities engage in commercial transactions as market participants. White v. Massachusetts Council ofConstruction Employers, 460 U.S. 204, 75 L.Ed.2d 1, 103 S.Ct. 1042
(1983); Reeves, Inc. v. Stake, 447 U.S. 429, 65 L.Ed.2d 244,100 S.Ct. 2271 (1980); Hughes v. Alexandria Scrap Corp., 426 U.S. 794,49 L.Ed.2d 220, 96 S.Ct. 2488 (1976).
In Hughes, supra, the Maryland legislature, in an attempt to encourage the recycling of abandoned automobiles, offered a bounty for every Maryland-titled automobile converted into scrap if the scrap processor supplied documentation of ownership. An amendment to the Maryland statute imposed more exacting documentation requirements on out-of-state than in-state processors and out-of-state processors in turn demanded more exacting documentation from those who sold the junked automobiles for scrap. As a result, it was easier for those in possession of the automobiles to sell to in-state processors. In upholding the Maryland statute in the face of a commerce clause challenge, the court concluded that "nothing in the purposes animating the commerce clause prohibits a state, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others." Because Maryland was participating in the market, rather than acting as a market regulator, the court concluded that the commerce clause was not offended.
In Reeves, supra, the court upheld a South Dakota policy to confine the sale of cement by a state-operated cement plant to South Dakota residents.
 "The basic distinction drawn in Alexandria Scrap
between states as market participants and states as market regulators makes good sense and sound law. As that case explains, the commerce clause responds principally to state taxes and regulatory measures impeding free private trade in the national market place. There is no indication of a constitutional plan to limit the ability of the states themselves to operate freely in the free market." Reeves, 447 U.S. at 436, 437.
The conclusion in Hughes and Reeves was followed in White v.Massachusetts Council of Construction Employers, supra, where the court upheld a mayoral executive order which required that all construction projects funded by city funds be performed by a work force consisting of at least half residents of Boston. The court also noted that considerations of state sovereignty support the market participant limitation on the commerce clause.
 "Restraint in this area is also counseled by considerations of state sovereignty, the role of each state as guardian and trustee for its people (citations omitted) and the long recognized right of trader or manufacturer, engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal (citations omitted). Moreover, state proprietary activities may be, and often are, burdened with the same restrictions imposed on private market participants. Evenhandedness suggests that, when acting as proprietors, states should similarly share existing freedoms from federal constraints, including the inherent limits of the commerce clause. White, 75 L.Ed.2d at 6 (footnote 3).
It is our opinion that the state of Kansas and the municipal and quasi-municipal entities that are authorized to hold public funds participate in the banking market as bank customers and, therefore, the commerce clause does not limit their ability to place their funds only in financial institutions with home offices in the state of Kansas.
IV. EQUAL PROTECTION
The fourteenth amendment contemplates interference with state authority: "no state shall . . . deny to any person . . . the equal protection of the law." Gregory v. Ashcroft, supra. We address whether the state may discriminate against branches of a national bank that have home offices out of state by refusing to consider them as public depositories.
The equal protection clause addresses disparity of treatment by a state between classes of individuals (or, in this case, corporations) whose situations are arguably indistinguishable.Peterson v. Garvey Elevators Inc., 252 Kan. 976 (1993). When a statute is attacked as violative of the equal protection clause, the test is whether the classification has some reasonable basis.Schweiker v. Wilson, 450 U.S. 221, 101 S.Ct. 1074, 67 L.Ed.2d 186,198 (1981). If so, the statute will not offend the 14th amendment simply because, in practice, it results in some inequity.Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153,25 L.Ed.2d 491 (1970).
 "The 14th amendment does not prohibit legislation merely because it is special, or limited in its application to a particular geographical or political subdivision of the state. Rather, the equal protection clause is offended only if the statute's classification rests on grounds wholly irrelevant to the achievement of the state's objective. (Citations omitted). Social and economic legislation carries with it a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality. (Citations omitted). We will not overturn such a statute unless the varying treatment of different groups . . . is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislative actions were irrational." Kadrmas v. Dickinson Public Schools, 487 U.S. 450, 101 L.Ed.2d 399, 108 S.Ct. 2481 (1988).
Because the state public depository laws are economic legislation, we review the application of the equal protection clause under the rational basis level of scrutiny which allows these laws to pass constitutional muster unless the classification rests on grounds wholly irrelevant to the achievement of the state's objective.
In Northeast Bank Corp. v. Board of Governors, 472 U.S. 159,86 L.Ed.2d 112, 105 S.Ct. 2545 (1985) the United States Supreme Court upheld a Connecticut statute that allowed a bank holding company with its principal place of business in a New England state to acquire a Connecticut bank but denied that ability to a bank holding company domiciled outside of the New England region. The Court concluded that banking and related financial activities are of profound local concern and upheld the statute against equal protection objections because of the statute's objective of preserving a close relationship between those in the community who need credit and those who provide it.
Kansas law has always placed great stock in keeping its public fund depositories within close geographical proximity to the investing unit and it is not unreasonable to conclude that the state and its municipalities as banking customers have an interest in preserving a close relationship with only those depositories that are headquartered in this state as opposed to financial institutions domiciled in California or New York.
Because the public depository statutes are clothed with a presumption of constitutionality, it is incumbent upon the proponent making the allegation of unconstitutionality to establish that the statutes rest on grounds wholly irrelevant to achievement of the state's objective. We have no such evidence and, therefore, it is our opinion that the Kansas public depository statutes have a rational basis and do not offend thefourteenth amendment.
CONCLUSION
It is our opinion that K.S.A. 9-1401, K.S.A. 1994 Supp. 12-1675
and the statutes contained in article 42 of chapter 75 of the Kansas statutes annotated which require state funds to be deposited only in state or national banks with home offices in the state of Kansas are not preempted by the Riegle-Neal act because there is no conflict and it was not the intent of congress to usurp the state's right to decide where the state and its municipalities may deposit their funds because to interpret otherwise would render title I, section 102(b)(f)(2) of the Riegle-Neal act unconstitutional as applied because congress may not exceed its delegated powers and violate the tenth amendment. Furthermore, the commerce clause does not apply to the state of Kansas and its municipalities when they participate in the market as banking customers. Finally, the equal protection clause is not offended because the public fund depository statutes have a rational basis in preserving a close geographical relationship with the financial institutions that hold public funds. To conclude otherwise would invalidate numerous statutes that embody a longstanding policy of this state. The authority to establish such a policy is a fundamental attribute of state sovereignty which cannot be usurped by the federal government. It is the prerogative of the legislature to alter this policy should it determine that the interests of the citizenry are not well served by restricting the deposit of public funds to only those financial institutions with home offices in this state.
We understand that the legislature will have to grapple with the issue of whether to accept interstate banking and branching before June 1, 1997 and, perhaps, at the same time it would be appropriate to consider the public fund depository policy of the state.
Very truly yours,
 CARLA J. STOVALL Attorney General of Kansas
 Mary Feighny Assistant Attorney General
CJS:JLM:MF:jm